# EXHIBIT "A"

Andrew G. Deiss (USB 7184)
Wesley D. Felix (USB 6539)
DEISS LAW PC
10 West 100 South, Suite 425
Salt Lake City, UT 84101
Telephone: (801) 433-0226
adeiss@deisslaw.com
wfelix@deisslaw.com

*Counsel for Todd Mandel*

---

### IN THE THIRD JUDICIAL DISTRICT COURT
### IN AND FOR SUMMIT COUNTY

| | |
|---|---|
| TODD MANDEL, an individual, | **COMPLAINT AND JURY DEMAND** |
|     Plaintiff, | |
| vs. | |
| HOLLY HAFERMANN, a/k/a Skylar Grey, VANESSA OSTOVICH, ELLIOTT TAYLOR, and DOES 1 through 10. | Civil No. |
|     Defendants. | Tier 3 |

TODD MANDEL ("Mandel"), by and through undersigned counsel, hereby brings this action against HOLLY HAFERMANN ("Hafermann"), VANESSA OSTOVICH ("Ostovich"), ELLIOTT TAYLOR ("Taylor"), individually, and DOES 1 through 10.  In support of his claims, Mandel states as follows:

### PARTIES, JURISDICTION AND VENUE

1.      Mandel is an individual residing in Park City, Utah.

2.      On information and belief, Hafferman is an individual residing in St. Helena, California.

3.    On information and belief, Ostovich is an individual residing in Northridge, California.

4.    On information and belief, Taylor is an individual residing in St. Helena, California.

5.    This Court has jurisdiction over this action pursuant to UTAH CODE ANN. § 78A-5-102(1).

6.    This Court has personal jurisdiction over Defendants pursuant to UTAH CODE ANN. § 78B-3-205 and the Due Process Clause of the Fourteenth Amendment of the United States Constitution.  Specifically, in addition to transacting business and contracting to supply services in Utah, Defendants' conduct complained of herein was and is purposefully directed toward Mandel in Utah and was intended to cause, and has caused, injury to Mandel in Utah.

7.    The claims for relief relate to causes of action which substantially arose in Summit County.  Venue therefore lies in this Court pursuant to UTAH CODE ANN. § 78B-3-307.

## GENERAL ALLEGATIONS

8.    Mandel and Hafermann were introduced to each other in 2009.  They quickly formed a deep emotional bond, and they were engaged to be married within ten weeks of meeting each other.

9.    In the beginning, Mandel and Hafferman's relationship was strictly personal. Mandel advised on Hafermann's career in his capacity as her partner, but did not manage her career or business interests.  At that time, Hafermann was a fledgling artist who lacked the contacts and relationships necessary to achieve success in the music industry.

10.    By early 2010, Mandel fully recognized Hafermann's potential.  Mandel also recognized that Hafermann's career was not progressing due to a lack of direction.  Mandel and

Hafermann agreed that Mandel's skills in deal making and negotiation were the missing ingredient in Hafermann's career.

11.     Mandel replaced Hafermann's prior manager and purchased a studio for Hafermann to begin recording.  At Hafermann's request and agreement, Mandel expressly promised to exclusively manage Hafermann in exchange for 20% of all earnings from Hafermann's songs, work, music, intellectual property, and artistic creations ("Management Agreement").

12.     Mandel and Hafermann formed Thunder Bay Touring, LLC, for the purposes of live performance costs and expenses, and they formed Psycho Killer Music, LLC, for the purposes of intellectual property and merchandise.  Mandel owns 40% of both companies, and Hafermann owns 60% of both companies.  Mandel formed Mandel Music Group, LLC, for the purpose of management costs, which he was the sole member.

13.     Prior to Mandel becoming Hafermann's manager, Hafermann spent around two decades in the music industry with limited accomplishment to show for it.  Hafermann had all but given up on her music career, moving to a cabin in the woods of Oregon.  In Hafermann's words during an interview in 2016:

> I had hated music at that point. I grew up loving music, and then I moved to LA and got totally corrupted. It ruined everything. I thought 'Why did I even decide to do music for my career?'

14.     Mandel worked tirelessly to develop contacts in the music industry to place Hafermann's songs with well-known and successful artists.  Mandel's efforts quickly paid off in 2010, when he negotiated the placement of her song "Love the Way You Lie" with record producer Alexander Grant.  Ultimately, the song was recorded by Eminem and Rihanna, whom have combined to sell more than 500 million records over the course of their careers.  Upon

release, the song penned by Hafermann debuted at number two and spent seven consecutive weeks at number one on the Billboard Hot 100; it was the third highest selling single of 2010, with more than 4 million units sold, and; it was nominated for multiple Grammy awards, including record of the year.

15.     Despite a rapid career progression, Hafermann demanded to have a wedding as soon as possible, and she diligently planned and organized the ceremony.  On or about November 23, 2012, Mandel and Hafermann were lawfully married in the state of Utah.

16.     Mandel and Hafermann resided together in Park City, Utah, continuously from September 2009 until June 2017.  During this time, Mandel and Hafermann enjoyed a business and marriage that allowed them to tour the world together.  Mandel was the primary contact for all matters of Hafermann's career and business.  His responsibilities included working with record labels, publishers, attorneys, agents and others to plan, create and maintain his and Hafermann's business.  Mandel was actively involved in the development each of Hafermann's recordings and song placements during their business relationship.

17.     At the same time, Mandel was a devoted, faithful, and dutiful spouse who passionately worked with Hafermann to build a beautiful life.  In 2016, Hafermann expressed her desire to build the couple's dream home.  In turn, the couple purchased the land next door to their existing home and hired an architect to design and build the new home, which included a recording studio, rehearsal space, and five bedrooms.  Moreover, in or around October 2016, they paid an initial $75,000 deposit toward a membership with an exclusive country club. Mandel and Hafermann were thrilled about their future together and made elaborate plans to create a space to start their family and grow their business.

18.     Prior to the interference from Taylor, the relationship between Mandel and Hafermann was close, loving and viable, and they were happily married with genuine love and affection between them.

### Mr. Taylor

19.     Taylor is an aspiring musician, actor, artist, and model.  He is heir to his father's development and construction empire, which is responsible for building more than two-thousand restaurants, hotels, bars, nightclubs and hospitality locations across the United States.  Taylor has unsuccessfully sought to build a music career since his childhood.

20.     In 2016, Taylor co-founded a brewery business.  He combined forces with two other wealthy children of successful businessmen.  The partners named the company "Sons Beer," reflecting the association with their famous and established fathers.

21.     A neighbor introduced Mandel and Hafermann to Taylor on Memorial Day Weekend of 2016.  By Taylor's design, the three became apparent friends, and Taylor visited Mandel and Hafermann on a regular basis.  Unbeknownst to Mandel, Taylor believed that Hafermann was his ticket to "show business," and Mandel was the only obstacle in his way.

22.     In December 2016, Taylor began visiting more frequently, starting his campaign to replace Mandel in Hafermann's life with the illusion of friendship.  Over a period of months, Hafermann fell victim to Taylor's constant influence and seduction.  Taylor called and texted her continuously, day and night, despite his full awareness of her and Mandel's marriage.  Their conversations would often go on for hours.  On information and belief, Taylor offered business advice to Hafermann and proposed that she end her marriage.  On several occasions, Taylor told Hafermann that he would make her "the happiest person in the world."  On information and belief, Taylor purchased and built a recording studio in his home in St. Helena, California, in

order to seduce Hafermann during her marriage with Mandel.  Using these and other schemes,

Taylor slowly chipped away at the bond that Mandel and Hafermann built over several years by

using his wealth and charm to seduce Hafermann and poison her affection of Mandel.

23.     On information and belief, while Mandel and Hafermann were married, between

or around December 2016 and November 2017, Taylor bought gifts and wrote letters for

Hafermann.  One such letter stated:

> My Sweet Angel,
>
> At this very moment you are around 5,316 miles away from me . . . But even though
> you are an entire ocean & continent away I can truly say I have never felt closer to
> someone in my life.
>
> The wind blows, I smell you . . .
> The warmth of the sun on my face, your kiss . . .
> The hot water of the shower on my body, your touch . . .
>
> You are everything around me, near me.  Far away from me and in my deepest
> dreams.
>
> . . .
>
> Your [sic] my morning tea.  Your [sic] the flowers blooming around me, the shade
> of the trees on me, the smell of Christmas morning . . .
>
> I love you so much baby as I sit patiently to hold you in my arms again & to whisper
> in your ear . . . "You are the most important thing in this world to me . . . I love
> you."
>
> -Elliott

24.     On information and belief, between or around December 2016 and November

2017, Taylor initiated and carried on an adulterous, sexual relationship with Hafermann.  During

this time, on information and belief, Taylor and Hafermann met secretly and made efforts to

conceal their relationship from Mandel.

25.      In around May 2017, Mandel confronted Hafermann and she confessed to having an affair.  Mandel was heart-broken and stunned, especially given their ongoing future plans together.  Within days after making the confession, Hafermann told Mandel that she was going to stay with her mother in Oregon.  Hafermann loaded up a Range Rover that she and Mandel recently purchased with the equipment from their home recording studio and left Utah.

26.      Instead of going to Oregon, between May and June of 2017, on information and belief, Hafermann moved in with Taylor in his home in St. Helena, California.  Soon thereafter, on June 12, 2017, Hafermann filed a Complaint for Divorce to dissolve her and Mandel's marriage.

27.      Despite Taylor's intrusion into the marriage, both Hafermann and Mandel were aware that they still had a potent and successful business relationship.  Before, during, and after the divorce proceedings, Mandel and Hafermann maintained their business interests with an understanding that Mandel's role was crucial to the development of Hafermann's career.

28.      Mandel and Hafermann amicably settled their divorce during a mediation held in Salt Lake City, Utah, on September 26, 2017.   At the mediation, Mandel agreed to settlement in order to salvage the business relationship and to continue to grow Hafermann's career.  The result of the mediation was a binding contract ("New Agreement") in which Hafermann agreed to employ Mandel as her manager for a period of five years and pay him, without limitation, 20% of all gross income earned from all of Hafermann's sources of business.

29.      On November 3, 2017, the day that Hafermann submitted final divorce papers to this Court, Taylor posted the following on Instagram:



30.     On November 6, 2017, the day that this Court entered Hafermann and Mandel's Decree of Divorce, Hafermann posted the following on Instagram:



31.     On information and belief, Hafermann and Taylor were engaged to be married within ten weeks of the entry of Hafermann and Mandel's Decree of Divorce.

### *Mr. Rothenberg*

32.    Paul Rothenberg ("Rothenberg") is an entertainment attorney, licensed to practice in California and New York.  His practice includes representing many of today's most popular and relevant musicians.

33.    Rothenberg acted as legal counsel to Mandel, Hafermann, and each of the entities associated with Mandel and Hafermann's business, including MMG and Psycho Killer Music.

34.    At all relevant times, Rothenberg regularly travelled to Park City, Utah, to meet with Mandel and Hafermann for business-related matters.

### *December 5, 2017, Business Meeting*

35.    The Decree of Divorce was the memorialization of the New Agreement entered into during the parties' mediation of September 26, 2017.  Among other things, the Decree of Divorce ordered Mandel and Hafermann to work with Rothenberg to formalize the New Agreement in accordance with the terms executed at mediation.  Specifically, paragraph 12 of the Decree of Divorce states:

> Respondent currently has an employment contract as [Hafermann's] manager. The parties shall work together with Paul Rothenberg to negotiate and execute a new management agreement no later than January 1, 2018, that includes the following terms: minimum of 5-year agreement in which Respondent continues to act as [Hafermann's] manager; Respondent's salary of 20% from all of [Hafermann's] gross earnings including but not limited to income from the following sources: UMPG, BMI, Sound Exchange, Neighboring Rights, live performances, endorsements etc. less touring production costs. During this 5-year term, Respondent shall earn 20% from all sources of Petitioner's business from all sources without limitation; after the expiration of the 5-year term, Respondent shall continue to earn 20% of all earnings from any of Petitioner's songs, work, music, intellectual property, artistic creations etc. created from the date of the marriage through September 30, 2017. The management agreement shall also include a sunset clause in accordance with industry standards and pursuant to Rothenberg's advice.

36.     Hence, the New Agreement was executed at mediation, but Rothenberg's participation was necessary to formalize the sunset clause in accordance with music industry standards.

37.     As required by the Decree of Divorce, on December 8, 2017, Mandel and Hafermann met with Rothenberg at his office in Los Angeles, California.  The meeting was scheduled for the purposes of drafting the sunset clause, recapping the year's business, and projecting business for 2018.  Mandel travelled from his home in Park City, Utah, solely for this meeting.

38.     At the outset of the meeting, Hafermann clearly expressed that she did not intend on preparing a document consistent with the terms of the New Agreement and Decree of Divorce.  Instead, Hafermann, with the assistance of Rothenberg, sought to renegotiate terms that were less favorable to Mandel.  Among other things, they proposed to reduce Mandel's management salary from 20% gross to 15%.

39.     Mandel declined to renegotiate the terms of the New Agreement, and the meeting ended with an understanding by Hafermann, Mandel, and Rothenberg that Rothenberg would draw up the document consistent with the terms executed under the New Agreement.

### *Ms. Ostovich*

40.     In or about January 2012, Mandel hired Ostovich as an MMG employee to act as Hafermann's personal assistant.  Her responsibilities were to assist Hafermann in picking up groceries, responding to phone calls, making appointments, making travel arrangements, handling Hafermann's wardrobe, and similar duties.

41.     Throughout her employment with MMG, and later Psycho Killer Music, Ostovich sought to work with Mandel to develop as a manager in the music industry.

42.     On information and belief, Ostovich is currently acting as Hafermann's manager.

### *December 13, 2017, Holiday Party*

43.     On December 13, 2017, Mandel, Hafermann, and Ostovich attended a holiday party organized by Hafermann's record company.  Every year, the holiday party is the culmination of the year's events and serves as an important networking event for the music industry.

44.     Hafermann was aware that Mandel was emotionally distraught from Taylor's conduct in ending their marriage.  Despite the importance of the event and the effect she knew it would have on Mandel, Hafermann brought Taylor without invitation to the "invitation-only" party.  Shortly after Mandel arrived at the party, he shook hands with Taylor.  After shaking hands, Mandel kept his distance from Taylor and Hafermann, because he was hurt and flustered.

45.      Shortly after Mandel and Taylor shook hands, Ostovich approached Mandel and stated how sorry she was that Hafermann "blind-sided" Mandel at the party.  Immediately after speaking with Ostovich, Mandel left the party to go to a friend's house.

46.     As Mandel waited for his ride to leave the party, Ostovich approached him again and offered to give him a ride.  Mandel accepted and Ostovich dropped him off.

47.     At or about 9:46 p.m., Hafermann sent the following text message to Mandel:

I'm sorry I brought [Taylor] tonight.  I just knew at some point you of cross [sic] paths and the last couple of times I tried to bring him around you found excuses to not be there...  that's why I didn't tell you he was coming.  I wanted us to cross this bridge.

48.     At or about 10:52 p.m., Hafermann then sent the following text message to Mandel:  "So I heard some shit and I need to know if it's true.  Did you threaten my life and [Taylor's] life and say we have 2 hours?  That's how I took it...  you have PI's, cameras in the house, and we have 2 hours."

11

49.     Mandel did not make any statement or threat of violence against Hafermann or Taylor.  Mandel did not hire a private investigator to follow Hafermann or Taylor, nor did he state that he hired a private investigator to follow Hafermann or Taylor.   Mandel did not plant surveillance equipment in Hafermann's home or cell phone, nor did he state that he planted surveillance equipment in Hafermann's home or phone.  Rather, Mandel intended to move his and Hafermann's relationship forward in a professional fashion.  In fact, at or about 12:08 a.m., Mandel sent the following text message in response to the message sent from Hafermann:

> Apology accepted.  I do not appreciate you trying to instigate a scene and belittle me in front of our business peers tonight.  I think you've had some drinks.  I'm not sure why you are bringing hostility into this conversation.  No one has threatened anyone.  Tomorrow is a new day.  I look forward to crushing it together!

50.     Thus, Mandel expressed both the falsity of the statements and his intent to carry on with business as usual shortly after Hafermann asked him about the false statements.

51.     On information and belief, Ostovich, Hafermann, Taylor, and Rothenberg fabricated the false story, among other things, to retaliate against Mandel for declining to renegotiate the terms of the New Agreement and to justify the removal of Mandel in violation of the New Agreement and the Decree of Divorce.

52.     On information and belief, on or about December 13, 2017, Ostovich, Hafermann, Taylor, Rothenberg, and agents acting on their behalf or under their direction, had a meeting of the minds to use the fabricated statements for these and other purposes.

### *TRO Proceedings*

53.     Two days after the holiday party, on December 15, 2017, TMZ.com ("TMZ") published an article related to a temporary restraining order sought by Hafermann against Mandel, which was picked up by several international publications, including People, Glamour, and New York Daily News.  On information and belief, Ostovich, Hafermann, and Rothenberg,

or an agent acting on their behalf, provided notice of the temporary restraining order to TMZ and

other entertainment news outlets before they were filed.

54. The December 15, 2017, TMZ report stated:

Skylar Grey says she desperately needs protection from her ex-husband ... a man
she claims is secretly recording video of her in her home, and threatening her
boyfriend.

In legal docs, Skylar says Todd Mandel hired private investigators to track her
current bf, Elliott Taylor. She also says her ex has threatened to physically harm
Elliott.

According to the docs, Mandel is also surreptitiously recording her in her home ...
using hidden cameras and recording devices to monitor her every move and word.
Skylar -- who's featured on Eminem's new album -- says she found out about this
Wednesday night during a party ... when Mandel told her he was "stalking me and
is following and monitoring me and my boyfriend."

In the docs, she says she learned Mandel has screenshots of private pics of her. The
most menacing part came when Mandel allegedly told her "he planned to physically
hurt her," and he was going to do it within the next 2 hours.

Although he, apparently, didn't attack her that night ... she believes he's violent and
dangerous. She requested, and was granted, a restraining order requiring Mandel to
have no contact and stay 100 yards away from her, Elliott and her
roommate/assistant.

55. On December 15, 2017, Hafermann filed a temporary restraining order ("TRO

Proceedings") against Mandel, by and through an attorney whose offices were one floor below

Rothenberg's office in Los Angeles, California.  The documents filed in the TRO Proceedings

falsely alleged, in a sworn statement by Hafermann, that:

Mr. Mandel has been following, tracking, and stalking me; he hid recording devices
in my phone; he has a private investigator watching me; he threatened violence and
to physically hurt me; and he threatened to expect this violence in two (2) hours.

56. The TRO Proceedings were filed around two days after Mandel expressed that he

never made the false statements and that he was ready to set aside the personal issues with

Taylor to continue his and Hafermann's successful business together.

57.    On information and belief, Ostovich, Hafermann, and Rothenberg, or an agent acting on their behalf, provided notice of the TRO Proceedings to entertainment media outlets after they were filed in order to retaliate against Mandel, among other things, for declining to renegotiate the terms of the New Agreement and Decree of Divorce and to justify Mandel's termination, in violation of the New Agreement and Decree of Divorce.

58.    Likewise on December 15, 2017, and in violation of the New Agreement and Decree of Divorce, Hafermann sent a letter of termination to Mandel, by and through Mandel's attorney and Rothenberg's associate.  The letter stated:

> Dear Todd:
>
> We have just been advised that Holly Brook Hafermann p/k/a "Skylar Grey" has elected to terminate her management relationship with Mandel Music Group.
>
> Accordingly, this letter shall constitute formal written notice of such termination, effective immediately.
>
> We apologize for the necessary formality of this letter.

59.    On February 15, 2018, after a full evidentiary hearing in which the court developed testimony and the factual background of the events

60.    The TRO Proceedings were dismissed in Mandel's favor.

### April 17, 2018, Mediation

61.    After Hafermann wrongfully terminated Mandel's employment, she continued to disavow the New Agreement and the terms of Decree of Divorce, including by refusing to allow Mandel to act as her manager and refusing to pay royalties and income.  On information and belief, Hafermann's repudiation of the New Agreement and Decree of Divorce occurred, at least in part, under the direction of Rothenberg.

62.     Through his divorce attorney, Mandel sought to resolve the issues related to the New Agreement and the Decree of Divorce, and he agreed to mediate at Hafermann's request. On April 17, 2018, the mediation was held in Salt Lake City, Utah.

63.     Ostovich attended the mediation for the purposes of assisting and accessing information related to Hafermann's business accounts.  Unbeknownst to Mandel, while he and Hafermann were in settlement discussions, Ostovich secretly left the mediation and drove her rental car to Mandel's home in Park City.

64.     On information and belief, Ostovich contacted Mandel's housecleaner and asked her to change her cleaning appointment at Mandel's house to coincide with the mediation, which allowed Ostovich to gain access to the home.

65.     Security camera footage shows Ostovich entering Mandel's home and stealing his personal property, including, but not limited to, computer hard drives containing intellectual property and Mandel's personal safe.

66.     The intellectual property contained in the stolen hard drives includes hundreds of extremely valuable songs owned by Mandel, which were necessary for Mandel to conduct business.

67.     On information and belief, Ostovich stole the property at Hafermann's direction.

**FIRST CAUSE OF ACTION**
**Defamation Against Hafermann and Ostovich**

68.     Mandel hereby incorporates and re-alleges each and every allegation in paragraphs 1 through 67, as though fully set forth herein.

69.     On information and belief, on or around December 12, 2017, Hafermann and Ostovich published false and defamatory statements concerning Mandel to third parties, including entertainment media companies.

70.     Hafermann and Ostovich published statements, referring to Mandel by name, falsely stating, among other things, that Mandel threatened to murder Hafermann and Taylor, and was unlawfully recording audio and video inside Hafermann's apartment and cell phone.

71.     The statements were not privileged including because they were published by Hafermann and Ostovich with malice, hatred, ill will, and with the intent to injure Mandel; they were published to persons who had no legally justified reason for receiving the false statements, and/or; they were excessively published to more persons than necessary to further the objectives of proposed litigation or to resolve a dispute.

72.     Hafermann's and Ostovich's statements constitute defamation per se because they falsely charged Mandel with criminal conduct and conduct which is incongruous with the exercise of business, trade, profession, or office.

73.     The published statements were made with knowledge of their falsity or with reckless disregard to their falsity.  Such statements have exposed and continue to expose Mandel to contempt, hatred, ridicule, and obloquy.

74.     As a direct and proximate result of the published statements, Mandel has suffered and continues to suffer special and specific damages, including, without limitation, shame, mortification, severe emotional distress, and irreparable harm to Mandel's reputation within the business community, all to his damage in an amount in excess of the tier 3 threshold to be determined at trial.

75.     Further, as a direct and proximate result of the published statements, Mandel has lost all of the clients he once managed and other business opportunities.

76.     Hafermann's and Ostovich's acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that

manifests a knowing and reckless indifference toward, and a disregard of, the rights of others. Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Hafermann and Ostovich and deter such conduct in the future.

## SECOND CAUSE OF ACTION
### False Light Against Hafermann and Ostovich

77.     Mandel hereby incorporates and re-alleges each and every allegation in paragraphs 1 through 76, as though fully set forth herein.

78.     Hafermann's and Ostovich's defamatory statements concerned Mandel and placed Mandel in a false light, including by falsely accusing Mandel of criminal activities.

79.     The false light in which Mandel was placed by Hafermann's and Ostovich's defamatory statements would be highly offensive to a reasonable person.

80.     The false light in which Mandel was placed by Hafermann's and Ostovich's defamatory statements is highly offensive to Mandel.

81.     The defamatory statements were made with knowledge or with reckless disregard to their falsity and the false light in which they placed Mandel.

82.     As a direct and proximate result of Hafermann's and Ostovich's conduct, Mandel has suffered and continues to suffer general and special damages in an amount in excess of the tier 3 threshold to be determined at trial.  Without limitation, the defamatory statements were of such a nature to cause and were intended to cause irreparable damage to Mandel's reputation and lost business opportunities due to the false light in which they placed Mandel.

83.     Hafermann's and Ostovich's acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.

Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Hafermann and Ostovich and deter such conduct in the future.

## THIRD CAUSE OF ACTION
### Wrongful Use of Civil Proceedings Against Hafermann

84.     Mandel hereby incorporates and re-alleges each and every allegation in paragraphs 1 through 83, as though fully set forth herein.

85.     Hafermann actively took part in the initiation or procurement of civil proceedings against Mandel.

86.     Mandel was innocent of the claims brought against him.

87.     Hafermann did not have probable cause to initiate or procure the civil proceedings.

88.     Hafermann initiated or procured the civil proceedings primarily for a purpose other than that of bringing Mandel to justice.

89.     The proceedings were terminated in favor of Mandel.

90.     As a direct and proximate result of Hafermann's conduct, Mandel has suffered and continues to suffer general and special damages in an amount in excess of the tier 3 threshold to be determined at trial.  Without limitation, Hafermann and Ostovich directly and proximately caused Mandel severe or extreme emotional distress, loss of income, irreparable damage to Mandel's reputation, and lost business opportunities.

91.     Hafermann's acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.  Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Hafermann and Ostovich and deter such conduct in the future.

## FOURTH CAUSE OF ACTION
### Abuse of Process Against Hafermann

92.     Mandel hereby incorporates and re-alleges each and every allegation in paragraphs 1 through 91, as though fully set forth herein.

93.     Hafermann had an ulterior purpose for initiating or procuring civil proceedings against Mandel, including, without limitation, to oust Mandel from his employment.

94.     Hafermann's immediate objective for initiating or procuring civil proceedings against Mandel was not legitimate in the use of the process, including, without limitation, willfully and intentionally destroying Mandel's standing in the music industry.

95.     Hafermann acted in the use of civil proceedings not proper in the regular prosecution of the proceedings.

96.     As a direct and proximate result of Hafermann's conduct, Mandel has suffered and continues to suffer general and special damages in an amount in excess of the tier 3 threshold to be determined at trial.  Without limitation, Hafermann and Ostovich directly and proximately caused Mandel severe or extreme emotional distress, loss of income, irreparable damage to Mandel's reputation, and lost business opportunities.

97.     Hafermann's acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.  Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Hafermann and deter such conduct in the future.

## FIFTH CAUSE OF ACTION
### Breach of Contract Against Hafermann

98.     Mandel hereby incorporates and re-alleges each and every allegation in

paragraphs 1 through 97, as though fully set forth herein.

99.     The New Agreement entered into by Mandel and Hafermann constitutes a valid,

binding, and enforceable contract.

100.    Mandel performed his obligations under the New Agreement.

101.    Hafermann wrongfully terminated the New Agreement.

102.    Hafermann materially breached the New Agreement including when she

terminated the New Agreement.

103.    As a result of Hafermann's breaches, Mandel has suffered damages in an amount

in excess of the tier 3 threshold to be determined at trial.

## SIXTH CAUSE OF ACTION
### Promissory Estoppel Against Hafermann

104.    Mandel hereby incorporates and re-alleges each and every allegation in

paragraphs 1 through 103, as though fully set forth herein.

105.    Hafermann expressly promised to give 20% gross revenue generated by

Hafermann and 20% of all earnings from any of Hafermann's songs, work, music, intellectual

property, and artistic creations to Mandel.

106.    Acting with prudence and in reasonable reliance on that promise, Mandel, among

other things, forfeited his marital share of Hafermann's revenue and earnings from any of

Hafermann's songs, work, music, intellectual property, and artistic creations.

107.    Hafermann should have reasonably expected her promise would induce Mandel to forfeit his marital share of Hafermann's revenue and earnings from any of Hafermann's songs, work, music, intellectual property, and artistic creations.

108.    Hafermann knew that Mandel relied on her promise when he forfeited his marital share of Hafermann's revenue and earnings from any of Hafermann's songs, work, music, intellectual property, and artistic creations.

109.    Hafermann was aware of all material facts.

110.    Mandel relied on Hafermann's promise.

111.    Mandel's reliance on Hafermann's promise damaged him in an amount in excess of the tier 3 threshold to be determined at trial.

112.    Hafermann's acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.  Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Hafermann and deter such conduct in the future.

## SEVENTH CAUSE OF ACTION
### Wrongful Discharge Against Hafermann

113.    Mandel hereby incorporates and re-alleges each and every allegation in paragraphs 1 through 112, as though fully set forth herein.

114.    A clear and substantial public policy prevents an employer from terminating an employee by, among other things, manufacturing false and defamatory allegations for the purpose of terminating an employment contract.

115.    Hafermann's conduct in manufacturing false and defamatory allegations for the purpose of terminating an employment contract brought that public policy into play.

116.    The termination and Hafermann's conduct bringing the public policy into play are causally linked.

117.    As a direct and proximate result of Hafermann's conduct, Mandel has suffered and continues to suffer general and special damages in an amount in excess of the tier 3 threshold to be determined at trial.  Without limitation, Hafermann and Ostovich directly and proximately caused Mandel severe or extreme emotional distress, loss of income, irreparable damage to Mandel's reputation, and lost business opportunities.

118.    Mandel requests that Hafermann be held liable for reinstatement, back-pay, costs, and attorney's fees.

119.    Hafermann's acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.  Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Hafermann and deter such conduct in the future.

## EIGHTH CAUSE OF ACTION
### Alienation of Affections Against Taylor

120.    Mandel hereby incorporates and re-alleges each and every allegation in paragraphs 1 through 119, as though fully set forth herein.

121.    Mandel was the lawfully wedded husband of Hafermann to whom he was married for approximately four years prior to the relationship that developed between Hafermann and Taylor.

122.    Taylor acted to willfully and intentionally interfere with the marital relationship of Mandel and Hafermann, causing an alienation of Hafermann's affections toward Mandel.

123.    Taylor acted to willfully and intentionally interfere with the marital relationship of Mandel and Hafermann to the extent that Hafermann abandoned her marriage with Mandel.

124.    In or around December 2016, Taylor became acquainted with Mandel's wife, and Taylor, with actual knowledge of the relationship that existed between Mandel and his wife, began a course of conduct to willfully and deliberately seduce, entice and alienate the affections of Mandel's wife in Utah, with the intent to further wrongfully and maliciously injure Mandel; thus depriving Mandel of the company, consortium, society, assistance and services of his wife.

125.    Taylor's efforts to willfully alienate the affections of Mandel's wife from Mandel include, but are not limited to, the following:

a.    Taylor insinuated himself into the relationship of Mandel and Hafermann, using his friendship with them to spend time alone with Hafermann;

b.    Taylor sought to seduce a married woman and repeatedly entice her through the offer of wealth and a lavish lifestyle;

c.    Taylor sought to seduce a married woman and entice her through excessive communication by phone and text message;

d.    Taylor sought to seduce a married woman and entice her through insinuating himself into her business planning and decision-making;

e.    Taylor sought to seduce a married woman and entice her through the offer and performance of a sexual relationship;

f.    Taylor refused to recognize the wrongfulness of his actions and moved in with Hafermann before Mandel was served with a complaint for divorce; and

g.    Taylor held himself out to the community as Hafermann's partner.

126.    On information and belief, Taylor willfully and intentionally encouraged and promoted a sexual relationship with Hafermann while Mandel and Hafermann were married, which interfered with any possible reconciliation of the marriage.

127.    Taylor's acts were the controlling cause of the breakup of the marriage.

128.    As a result of the marital interference by Taylor, Mandel was deprived of the comfort, society, and consortium to which he was entitled by the virtue of marriage.

129.    As a direct and proximate result of Taylor's conduct, Mandel has suffered and continues to suffer general and special damages in an amount in excess of the tier 3 threshold to be determined at trial.  Without limitation, Taylor directly and proximately caused Mandel severe or extreme emotional distress including humiliation, anxiety, depression, sleeplessness, and mental anguish.

130.    Taylor's acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.  Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Taylor and deter such conduct in the future.

## NINTH CAUSE OF ACTION
### Conversion Against Hafermann and Ostovich

131.    Mandel hereby incorporates and re-alleges each and every allegation in paragraphs 1 through 130, as though fully set forth herein.

132.    On or around April 17, 2018, Hafermann and Ostovich willfully interfered with Mandel's possession and use of property for which he was entitled to immediate possession, by using court proceedings as means to enter Mandel's home without his permission.

133.    Hafermann and Ostovich deprived Mandel of the use and possession of property, including, but not limited to, computer hard drives containing intellectual property that are necessary for Mandel to conduct business.

134.    Hafermann and Ostovich have refused to return or to respond to Mandel's demand to return the stolen property.

135.    No lawful justification exists for Hafermann's and Ostovich's possession of or interference with Mandel's property.

136.    As a direct and proximate result of Hafermann's and Ostovich's conduct, Mandel has suffered and continues to suffer general and special damages in an amount in excess of the tier 3 threshold to be determined at trial.  Without limitation, Hafermann and Ostovich directly and proximately caused Mandel severe or extreme emotional distress, loss of income, irreparable damage to Mandel's reputation, and lost business opportunities.

137.    A constructive trust should be imposed on the assets, property, funds, profits, benefits, opportunities, and/or proceeds of Hafermann's, Ostovich's, and their other ventures (regardless of where, how, when, or to whom such assets, property, funds, profits, benefits, opportunities, and/or proceeds may have been transferred) for the benefit of Mandel.

138.    Further, the conduct as alleged in this Complaint demonstrates that Hafermann's and Ostovich's conduct was the result of conscious wrongdoing.  Applying the conscious wrongdoer doctrine, Hafermann and Ostovich should be required to account for and disgorge any and all assets, property, funds, profits, benefits, opportunities, and/or proceeds (regardless of where, how, when, or to whom such assets, property, funds, profits, benefits, opportunities, and/or proceeds may have been transferred) obtained as a result of conversion.

139.     Hafermann's and Ostovich's acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others. Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Hafermann and Ostovich and deter such conduct in the future.

## TENTH CAUSE OF ACTION
### Theft Against Ostovich and Hafermann

140.     Mandel hereby incorporates and re-alleges each and every allegation in paragraphs 1 through 139, as though fully set forth herein.

141.     In accordance with UTAH CODE ANN. § 76-6-408(1), Mandel asserts that Hafermann and Ostovich are guilty of theft for receiving, retaining, or disposing of the property of another knowing that it has been stolen, or believing that it probably has been stolen, or concealing, selling, withholding or aiding in the concealment, sale, or withholding of property from the owner, knowing the property to be stolen, intending to deprive the owner of it.

142.     As a direct and proximate result of Hafermann's and Ostovich's conduct, Mandel has suffered and continues to suffer general and special damages in an amount in excess of the tier 3 threshold to be determined at trial.  Without limitation, Hafermann and Ostovich directly and proximately caused Mandel severe or extreme emotional distress, loss of income, irreparable damage to Mandel's reputation, and lost business opportunities.

143.     In accordance with UTAH CODE ANN. § 76-6-412(2), Mandel is entitled to treble damages to be proven at trial and for costs of suit and reasonable attorney fees.

## ELEVENTH CAUSE OF ACTION
### Breach of Fiduciary Duty Against Hafermann and Ostovich

144.    Mandel hereby incorporates and re-alleges each and every allegation in paragraphs 1 through 143, as though fully set forth herein.

145.    Hafermann and Ostovich, as members, managers, and/or employees of Thunder Bay Touring and Psycho Killer Music, owed fiduciary duties to Thunder Bay Touring and Psycho Killer Music and its members, including duties of due care, loyalty, and acting in good faith and honesty.

146.    Hafermann and Ostovich failed to perform their respective fiduciary duties in good faith and with ordinary prudence by, among other things, attempting to destroy Mandel's ability to work in the music industry and publishing defamatory statements concerning Mandel.

147.    Hafermann failed to perform her respective fiduciary duties in good faith and with ordinary prudence by, among other things, knowingly and substantially participating, assisting, and/or encouraging her and Taylor's business interests over Mandel's.

148.    As a direct and proximate result of Hafermann's and Ostovich's conduct, Mandel has suffered and continues to suffer damages in an amount in excess of the tier 3 threshold to be determined at trial.

149.    Hafermann's and Ostovich's acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others. Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Hafermann and Ostovich and deter such conduct in the future.

## TWELFTH CAUSE OF ACTION
**Intentional Interference with Economic Relations Against All Defendants**

150.    Mandel hereby incorporates and re-alleges each and every allegation in paragraphs 1 through 149, as though fully set forth herein.

151.    Defendants intentionally interfered with Mandel's economic relations, among other things, by stealing Mandel's property, publishing defamatory statements concerning Mandel, ousting Mandel from his employment, and alienating the affections of Mandel's wife.

152.    Defendants acted for an improper purpose and/or using improper means to interfere with Mandel's economic relations.

153.    Defendants' disruption and interference with Mandel's economic relations has caused and continues to cause harm to Mandel.

154.    As a direct and proximate result of Defendants' conduct, Mandel has suffered and continues to suffer general and special damages in an amount in excess of the tier 3 threshold to be determined at trial.  Without limitation, Defendants directly and proximately caused Mandel severe or extreme emotional distress, loss of income, irreparable damage to Mandel's reputation, and lost business opportunities.

155.    Defendants acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.  Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Defendants and deter such conduct in the future.

### THIRTEENTH CAUSE OF ACTION
**Intentional Infliction of Emotional Distress Against All Defendants**

156.    Mandel hereby incorporates and re-alleges each and every allegation in paragraphs 1 through 155, as though fully set forth herein.

157.    Defendants' conduct including, but not limited to, stealing Mandel's property, publishing defamatory statements concerning Mandel, and alienating the affections of Mandel's wife, constituted extreme or outrageous or intolerable conduct.

158.    Defendants intended to cause emotional distress or acted with reckless disregard of the probability of causing emotional distress to Mandel.

159.    As a direct and proximate result of Defendants' conduct, Mandel has suffered and continues to suffer general and special damages in an amount in excess of the tier 3 threshold to be determined at trial.  Without limitation, Defendants directly and proximately caused Mandel severe or extreme emotional distress including humiliation, anxiety, depression, sleeplessness, and mental anguish.

160.    Defendants' acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.  Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Defendants and deter such conduct in the future.

### FOURTEENTH CAUSE OF ACTION
**Negligent Infliction of Emotional Distress Against All Defendants**

161.    Mandel hereby incorporates and re-alleges each and every allegation in paragraphs 1 through 160, as though fully set forth herein.

162.    Defendants' engaged in conduct they should have realized involved an unreasonable risk of causing emotional distress to others, including, but not limited to, stealing Mandel's property, publishing defamatory statements concerning Mandel, and alienating the affections of Mandel's wife, constituted extreme or outrageous or intolerable conduct.

163.    Defendants should have realized that their conduct could cause the sort of emotional distress that might result in illness or bodily harm.

164.    Defendants conduct unintentionally caused Mandel to sustain severe emotional distress, characterized by illness or bodily harm.

165.    As a direct and proximate result of Defendants' conduct, Mandel has suffered and continues to suffer general and special damages in an amount in excess of the tier 3 threshold to be determined at trial.

166.    Defendants' acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.  Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Defendants and deter such conduct in the future.

## FIFTEENTH CAUSE OF ACTION
### Conspiracy Against All Defendants

167.    Mandel hereby incorporates and re-alleges each and every allegation in paragraphs 1 through 166, as though fully set forth herein.

168.    Each of the Defendants combined and formed an agreement with the others to accomplish unlawful and wrongful objectives as set forth in this Complaint.

169.    Each of the Defendants had a meeting of the minds with the others to accomplish unlawful objectives.

170.     Each of the Defendants engaged in one or more unlawful, overt acts, including, but not limited to, by making defamatory statements, interfering with Mandel's economic relations and reputation, and alienating the affections of Mandel's wife.

171.     As a direct and proximate result of Defendants' conduct, Mandel has suffered and continues to suffer general and special damages in an amount in excess of the tier 3 threshold to be determined at trial.  Without limitation, Defendants directly and proximately caused Mandel severe or extreme emotional distress, loss of income, irreparable damage to Mandel's reputation, and lost business opportunities.

172.     Defendants' acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.  Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Defendants and deter such conduct in the future.

## ELECTION OF DISCOVERY TIER

Because Mandel pleads damages in excess of $300,000, this is a Tier 3 case pursuant to Rule 26(c)(3) of the Utah Rules of Civil Procedure.

## JURY DEMAND

Mandel demands a trial by jury on all matters that may be tried to a jury.

## PRAYER FOR RELIEF

For the reasons stated in this Complaint, Mandel prays for relief against Defendants as follows:

1. For economic damages in an amount to be alleged and proven at trial;

2. For non-economic damages in an amount to be alleged and proven at trial;

3. For punitive damages in an amount to be alleged and proven at trial;

4. For any further relief as the Court deems just and proper, including without
   limitation, attorney's fees, costs, pre- and post-judgment interest, and any other
   damages recoverable by law.

RESPECTFULLY SUBMITTED this 18th day of September, 2018.


            DEISS LAW P.C.

            /s/ Andrew G. Deiss
            Andrew G. Deiss

            *Counsel for Todd Mandel*

Plaintiff's Address:
2962 Westview Trail
Park City, Utah 84098

Andrew G. Deiss (USB 7184)
Corey D. Riley (USB 16935)
DEISS LAW PC
10 West 100 South, Suite 425
Salt Lake City, UT 84101
Telephone: (801) 433-0226
adeiss@deisslaw.com
criley@deisslaw.com

*Counsel for Todd Mandel*

---

## IN THE THIRD JUDICIAL DISTRICT COURT
## IN AND FOR SUMMIT COUNTY

| | |
|---|---|
| TODD MANDEL, an individual,<br><br>    Plaintiff,<br><br>vs.<br><br>HOLLY HAFERMANN, a/k/a Skylar Grey, VANESSA OSTOVICH, ELLIOTT TAYLOR, PAUL ROTHENBERG, ROTHENBERG, P.C., and DOES 1 through 10.<br><br>    Defendants. | **FIRST AMENDED COMPLAINT**<br><br>Civil No. 180500411<br><br>Honorable Kent Holmberg<br><br>Tier 3 |

TODD MANDEL ("Mandel"), by and through undersigned counsel, hereby brings this action against HOLLY HAFERMANN ("Hafermann"), VANESSA OSTOVICH ("Ostovich"), ELLIOTT TAYLOR ("Taylor"), PAUL ROTHENBERG ("Rothenberg"), individually, ROTHENBERG, P.C., and DOES 1 through 10.  In support of his claims, Mandel states as follows:

1

## PARTIES, JURISDICTION AND VENUE

1.      Mandel is an individual residing in Park City, Utah.

2.      On information and belief, Hafermann is an individual residing in St. Helena, California.

3.      On information and belief, Ostovich is an individual residing in Northridge, California.

4.      On information and belief, Taylor is an individual residing in St. Helena, California.

5.      On information and belief, Rothenberg is an individual residing in Los Angeles County, California.

6.      On information and belief, Rothenberg, P.C., is a professional corporation organized under the laws of New York State. This defendant is liable to Mandel in this action because of its own conduct and under principles of vicarious responsibility and respondeat superior for the acts of its agents, including Rothenberg.

7.      Does are individuals and/or entities whose true names are not presently known.

8.      This Court has jurisdiction over this action pursuant to UTAH CODE ANN. § 78A-5-102(1).

9.      This Court has personal jurisdiction over Defendants pursuant to UTAH CODE ANN. § 78B-3-205 and the Due Process Clause of the Fourteenth Amendment of the United States Constitution.  Specifically, in addition to transacting business and contracting to supply services in Utah, Defendants' conduct complained of herein was and is purposefully directed

toward Mandel and his marriage in Utah and was intended to cause, and has caused, injury to

Mandel and his marriage in Utah.

10.     The claims for relief relate to causes of action which substantially arose in

Summit County.  Venue therefore lies in this Court pursuant to UTAH CODE ANN. § 78B-3-307.

## **GENERAL ALLEGATIONS**

11.     Mandel and Hafermann were introduced to each other in 2009.  They quickly

formed a deep emotional bond, and they were engaged to be married within ten weeks of

meeting each other.

12.     In the beginning, Mandel and Hafermann's relationship was strictly personal.

Mandel advised on Hafermann's career in his capacity as her partner but did not manage her

career or business interests.  At that time, Hafermann was a fledgling artist who lacked the

contacts and relationships necessary to achieve success in the music industry.

13.     By early 2010, Mandel recognized Hafermann's potential.  Mandel also

recognized that Hafermann's career was not progressing due to a lack of direction.  Mandel and

Hafermann agreed that Mandel's skills in deal making and negotiation were the missing

ingredient in Hafermann's career.

14.     Mandel replaced Hafermann's prior manager—after Mandel paid the prior

manager $15,000—and purchased a studio for Hafermann to begin recording.  At Hafermann's

request and agreement, Mandel expressly promised to exclusively manage Hafermann in

exchange for 20% of all earnings from Hafermann's songs, work, music, intellectual property,

and artistic creations ("Management Agreement").

15.     Mandel and Hafermann formed Thunder Bay Touring, LLC, for the purposes of live performance costs and expenses, and they formed Psycho Killer Music, LLC, for the purposes of intellectual property and merchandise.  Mandel owns 40% of both companies, and Hafermann owns 60% of both companies.  Mandel formed Mandel Music Group, LLC, for the purpose of management costs, of which he was the sole member.

16.     Prior to Mandel becoming Hafermann's manager, Hafermann spent around two decades in the music industry with limited accomplishment to show for it.  Hafermann had all but given up on her music career, moving to a cabin in the woods of Oregon.  In Hafermann's words during an interview in 2016: "I had hated music at that point. I grew up loving music, and then I moved to [Los Angeles] and got totally corrupted. It ruined everything. I thought 'Why did I even decide to do music for my career?'"

17.     Mandel worked tirelessly to develop contacts in the music industry to place Hafermann's songs with well-known and successful artists.  Mandel's efforts quickly paid off in 2010, when he negotiated the placement of her song "Love the Way You Lie" with record producer Alexander Grant.  Ultimately, the song was recorded by Eminem and Rihanna, whom have combined to sell more than 500 million records over the course of their careers.  Upon release, the song penned by Hafermann debuted at number two and spent seven consecutive weeks at number one on the Billboard Hot 100; it was the third highest selling single of 2010, with more than 4 million units sold; and it was nominated for multiple Grammy awards, including record of the year.

18.     Despite a rapid career progression, Hafermann demanded to have a wedding as soon as possible, and she diligently planned and organized the ceremony.  On or about November 23, 2012, Mandel and Hafermann were lawfully married in the state of Utah.

19.     Mandel and Hafermann resided together in Park City, Utah, continuously from around September 2009 until around June 2017.  During this time, Mandel and Hafermann enjoyed a business and marriage that allowed them to tour the world together.  Mandel was the primary contact for all matters of Hafermann's career and business.  His responsibilities included working with record labels, publishers, attorneys, agents and others to plan, create and maintain his and Hafermann's business.  Mandel was actively involved in the development of each of Hafermann's recordings and song placements during their business relationship.

20.     At the same time, Mandel was a devoted, faithful, and dutiful spouse who passionately worked with Hafermann to build a beautiful life.  In 2016, Hafermann expressed her desire to build the couple's dream home.  In turn, the couple purchased the land next door to their existing Park City, Utah, home and hired an architect to design and build the new home, which included a recording studio, rehearsal space, and five bedrooms.  Moreover, in or around October 2016, they paid an initial $75,000 deposit toward a membership with an exclusive country club.  Mandel and Hafermann were thrilled about their future together and made elaborate plans to create a space to start their family and grow their business.

21.     Prior to the interference from Taylor, the relationship between Mandel and Hafermann was close, loving, and viable.  They were happily married with genuine love and affection between them.

### *Mr. Taylor*

22.     Taylor is an aspiring musician, actor, artist, and model.  He is heir to his father's

development and construction empire, which is responsible for building more than two-thousand

restaurants, hotels, bars, nightclubs, and hospitality locations across the United States.  Taylor

has unsuccessfully sought to build a music career since his childhood.  In 2016, Taylor co-

founded a brewery business.  He combined forces with two other wealthy children of successful

businessmen.  The partners named the company "Sons Beer," reflecting the association with

their famous and established fathers.

23.     A neighbor introduced Mandel and Hafermann to Taylor on Memorial Day

Weekend of 2016.  At all relevant times, Taylor knew that Mandel and Hafermann were married

and resided in the state of Utah.

24.     By Taylor's design, the three became apparent friends, and Taylor visited Mandel

and Hafermann on a regular basis.  Unbeknownst to Mandel, Taylor believed that Hafermann

was his ticket to "show business," and Mandel was the only obstacle in his way.

25.     In December 2016, Taylor began visiting Hafermann more frequently, starting his

campaign to replace Mandel in Hafermann's life with the illusion of friendship.  Over a period of

months, Hafermann fell victim to Taylor's constant influence and seduction.  Taylor called and

texted her continuously, day and night, despite his full awareness of her and Mandel's marriage.

Their conversations would often go on for hours.  On information and belief, Taylor offered

business advice to Hafermann and proposed that she end her marriage.  On several occasions,

Taylor told Hafermann that he would make her "the happiest person in the world."  On

information and belief, Taylor purchased and built a recording studio in his home in St. Helena,

California, in order to seduce Hafermann during her marriage with Mandel.  Using these and

other schemes, Taylor slowly chipped away at the bond that Mandel and Hafermann built over

several years by using his wealth and charm to seduce Hafermann and poison her affection of

Mandel.

      26.     On information and belief, while Mandel and Hafermann were married, between

or around December 2016 and November 2017, Taylor bought gifts and wrote letters for

Hafermann.  One such letter stated:

> My Sweet Angel,
>
> At this very moment you are around 5,316 miles away from me . . . But even though
> you are an entire ocean & continent away I can truly say I have never felt closer to
> someone in my life.
>
> The wind blows, I smell you . . .
> The warmth of the sun on my face, your kiss . . .
> The hot water of the shower on my body, your touch . . .
>
> You are everything around me, near me.  Far away from me and in my deepest
> dreams.
>
> . . .
>
> Your [sic] my morning tea.  Your [sic] the flowers blooming around me, the shade
> of the trees on me, the smell of Christmas morning . . .
>
> I love you so much baby as I sit patiently to hold you in my arms again & to whisper
> in your ear . . . "You are the most important thing in this world to me . . . I love
> you."
>
> -Elliott

      27.     On information and belief, between or around December 2016 and November

2017, Taylor initiated and carried on an adulterous, sexual relationship with Hafermann.  During

this time, on information and belief, Taylor met with Hafermann in secret and made efforts to conceal his relationship with Hafermann from Mandel.

28.     In or around May 2017, Mandel confronted Hafermann and she confessed to having an affair.  Mandel was heart-broken and stunned, especially given their future plans together.  Within days after making the confession, Hafermann told Mandel that she was going to stay with her mother in Oregon.  Hafermann loaded up a Range Rover and that she and Mandel recently purchased and a trailer hauling the equipment from their home recording studio, and left Utah.

29.     Instead of going to Oregon, between May and June of 2017, on information and belief, Hafermann moved in with Taylor in his home in St. Helena, California.  Soon thereafter, on June 12, 2017, Hafermann filed a Complaint for Divorce to dissolve her and Mandel's marriage.

30.     Despite Taylor's intrusion into the marriage, both Hafermann and Mandel were aware that they still had a potent and successful business relationship.  Before, during, and after the initiation of the divorce proceedings, Mandel and Hafermann maintained their business interests with an understanding that Mandel's role was crucial to the development of Hafermann's career.

31.     Mandel and Hafermann amicably settled their divorce during a mediation held in Salt Lake City, Utah, on September 26, 2017.  At the mediation, Mandel agreed to a settlement in order to salvage the business relationship and to continue to grow Hafermann's career.  At the mediation, Hafermann and Mandel entered into a binding, written contract ("New Agreement") in which Hafermann agreed to employ Mandel as her manager for a period of five years and pay

him, without limitation, 20% of all gross income earned from all of Hafermann's sources of business.  Mandel and Hafermann negotiated the terms of the New Agreement through counsel, and they both executed the contract.

     32.     On November 3, 2017, the day that Hafermann submitted final divorce papers to this Court, Taylor posted the following on Instagram:



     33.     On November 6, 2017, the day that this Court entered Hafermann and Mandel's Decree of Divorce, Hafermann posted the following on Instagram:



34.     On information and belief, Hafermann and Taylor were engaged to be married within ten weeks of the entry of Hafermann and Mandel's Decree of Divorce.

### *Mr. Rothenberg*

35.     Paul Rothenberg ("Rothenberg") is an entertainment attorney, licensed to practice in California and New York.  His practice includes representing many of today's most popular and relevant musicians. At all relevant times, Rothenberg was the sole owner of the law firm of Rothenberg, P.C.

36.     Rothenberg and Rothenberg, P.C., acted as legal counsel to Mandel, Hafermann, and the entities owned by Mandel and Hafermann, including Psycho Killer Music and Thunder Bay Touring.

37.     To the extent Rothenberg provided legal services to Mandel, both Rothenberg and Mandel understood that Rothenberg was Mandel's attorney.  For example, Rothenberg acted as legal counsel for Mandel's management business, including employment matters.

38.    At all relevant times, Rothenberg regularly travelled to Park City, Utah, to meet with Mandel to provide legal counsel.

39.    After Hafermann filed for divorce, Rothenberg continued to provide Mandel legal advice.  In or around July 2017, before the New Agreement was executed, Rothenberg flew to Utah to meet with Mandel.  Mandel and Rothenberg discussed Mandel's ownership interest in Psycho Killer Music and Thunder Bay Touring.  Rothenberg stated that he would advise Hafermann to start new companies to replace Psycho Killer Music and Thunder Bay Touring and expressed that Mandel's interest in the companies would hold no future value.  On information and belief, Rothenberg made this statement to compel Mandel to execute the terms of the New Agreement.

40.    On a number of occasions, from July 2017 until the mediation of September 26, 2017, Rothenberg advised Mandel on the terms of the New Agreement.  Specifically, Rothenberg advised Mandel to accept the terms of the New Agreement, including the 20% gross income.

41.    As the New Agreement materialized, Mandel started developing the next chapter of his music business.  During the marriage, Mandel turned away dozens of talented artists to focus all his energy on his and Hafermann's business.  After the collapse of the personal relationship, Mandel started accepting new artists for management business.  By November 2017, Mandel was in the process of signing two new writers and inquiries from other artists were increasing.

42.    Mandel also started developing a publishing company to build and market his music catalog to other artists, including the intellectual property that Mandel and Hafermann

11

jointly own.  Until December 2017, Rothenberg gave constant legal advice to Mandel for management and publishing opportunities, unrelated to Hafermann.  On information and belief, Rothenberg continues to represent one of the artists that Mandel signed during this period.

43.     After Mandel and Hafermann executed the New Agreement, Rothenberg was required to advise them regarding the industry standards for a five-year sunset provision in the New Agreement.

44.     On December 5, 2017, Mandel and Hafermann met with Rothenberg at his office in Los Angeles, California.  The meeting was scheduled to recap business for 2017, to project business for 2018, and to discuss the industry standards for the sunset clause.

45.     For the business matters, Rothenberg outlined certain offers received from major record and/or publishing companies, which included cash advances between $3 and $4 million.

46.     Thereafter, Hafermann and Rothenberg sought to renegotiate terms of the New Agreement, including to reduce Mandel's management salary from 20% gross to 15%.

47.     Mandel declined to renegotiate the terms of the New Agreement.  Hafermann, Mandel, and Rothenberg agreed that Rothenberg would draft a document consistent with the terms executed under the New Agreement with the inclusion of a sunset clause, reflecting industry standards.

### *Ms. Ostovich*

48.     In or about January 2012, Mandel hired Ostovich as an employee of Mandel Music Group to act as Hafermann's personal assistant.  Her responsibilities were to assist Hafermann in picking up groceries, responding to phone calls, making appointments, making travel arrangements, handling Hafermann's wardrobe, and similar duties.

49.     Throughout her employment with Mandel Music Group, and later Psycho Killer Music, Ostovich sought to work with Mandel to develop as a manager in the music industry.

50.     On information and belief, Ostovich replaced Mandel as Hafermann's manager, after the following events.

### *Holiday Party of December 13, 2017*

51.     On information and belief, in early December 2017, an ex-boyfriend of Hafermann's, Michael Hays, contacted Hafermann regarding his alleged entitlement to credit for certain songs released by an artist.  He also threatened to publish personal videos and photographs depicting Hafermann without her permission.

52.     On December 13, 2017, Hafermann, through counsel, sent a cease and desist letter to Hays.  The letter alleged that Hays was attempting to extort and blackmail Hafermann by "threatening to release sexually explicit photographs and videos of her" unless he was paid.  The letter also claimed, *inter alia*, that Hays was "generating, publishing and circulating Internet content that unlawfully defames Ms. [Hafermann]."

53.     Also on December 13, 2017, Mandel, Hafermann, and Ostovich attended a holiday party organized by Hafermann's record company.  Every year, the holiday party is the culmination of the year's events and serves as an important networking event for the music industry.

54.     Hafermann was aware that Mandel was emotionally distraught from Taylor's conduct in ending their marriage.  Despite the importance of the event and the effect she knew it would have on Mandel, Hafermann brought Taylor without invitation to the "invitation-only"

party.  Shortly after Mandel arrived at the party, he shook hands with Taylor.  After shaking

hands, Mandel kept his distance from Taylor and Hafermann, because he was hurt and flustered.

55.     Shortly after Mandel and Taylor shook hands, Ostovich approached Mandel and

stated how sorry she was that Hafermann "blind-sided" Mandel at the party.  Immediately after

speaking with Ostovich, Mandel left the party to go to a friend's house.

56.     As Mandel waited for his ride to leave the party, Ostovich approached him again

and offered to give him a ride.  Mandel accepted and Ostovich dropped him off.

57.     At or about 9:46 p.m., Hafermann sent the following text message to Mandel:

I'm sorry I brought [Taylor] tonight.  I just knew at some point you of cross [sic]
paths and the last couple of times I tried to bring him around you found excuses to
not be there...  that's why I didn't tell you he was coming.  I wanted us to cross this
bridge.

58.     At or about 10:52 p.m., Hafermann then sent the following text message to

Mandel: "So I heard some shit and I need to know if it's true.  Did you threaten my life and

[Taylor's] life and say we have 2 hours?  That's how I took it...  you have PI's, cameras in the

house, and we have 2 hours."

59.     Mandel did not make any statement or threat of violence against Hafermann or

Taylor.  Mandel did not hire a private investigator to follow Hafermann or Taylor, nor did he

state that he hired a private investigator to follow Hafermann or Taylor.  Mandel did not plant

surveillance equipment in Hafermann's home or cell phone, nor did he state that he planted

surveillance equipment in Hafermann's home or phone.  Rather, Mandel intended to move his

and Hafermann's relationship forward in a professional fashion.  In fact, at or about 12:08 a.m.,

Mandel sent the following text message in response to the message sent from Hafermann:

Apology accepted.  I do not appreciate you trying to instigate a scene and belittle me in front of our business peers tonight.  I think you've had some drinks.  I'm not sure why you are bringing hostility into this conversation.  No one has threatened anyone.  Tomorrow is a new day.  I look forward to crushing it together!

60.     Thus, Mandel expressed both the falsity of the statements and his intent to carry on with business as usual shortly after Hafermann asked him about the false statements.

61.     On information and belief, Ostovich, Hafermann, Taylor, and Rothenberg fabricated the false story, among other things, to retaliate against Mandel for declining to renegotiate the terms of the New Agreement, avoid paying Mandel his percentage of any cash advances from record or publishing, wrongfully justify the removal of Mandel in violation of the New Agreement, and/or conflate Mandel with the alleged extortion by Hays.

62.     On information and belief, on or about December 13, 2017, Ostovich, Hafermann, Taylor, Rothenberg, and agents acting on their behalf or under their direction, had a meeting of the minds to use the fabricated statements for these and other purposes, including using international publications as an aggregate communication to achieve an unlawful objective.

### *TRO Proceedings*

63.     Following the night of the holiday party, on December 15, 2017, TMZ.com ("TMZ") published an article related to a temporary restraining order sought by Hafermann against Mandel, which was subsequently picked up by several international publications, including People, Glamour, and New York Daily News.  On information and belief, Ostovich, Hafermann, and Rothenberg, or an agent acting on their behalf, provided notice of the temporary restraining order to TMZ and other entertainment news outlets before they were filed.

64.     The December 15, 2017, TMZ report stated:

15

Skylar Grey says she desperately needs protection from her ex-husband ... a man she claims is secretly recording video of her in her home, and threatening her boyfriend.

In legal docs, Skylar says Todd Mandel hired private investigators to track her current bf, Elliott Taylor. She also says her ex has threatened to physically harm Elliott.

According to the docs, Mandel is also surreptitiously recording her in her home ... using hidden cameras and recording devices to monitor her every move and word. Skylar -- who's featured on Eminem's new album -- says she found out about this Wednesday night during a party ... when Mandel told her he was "stalking me and is following and monitoring me and my boyfriend."

In the docs, she says she learned Mandel has screenshots of private pics of her. The most menacing part came when Mandel allegedly told her "he planned to physically hurt her," and he was going to do it within the next 2 hours.

Although he, apparently, didn't attack her that night ... she believes he's violent and dangerous. She requested, and was granted, a restraining order requiring Mandel to have no contact and stay 100 yards away from her, Elliott and her roommate/assistant.

65.     Some entertainment news outlets conflated the allegations against Mandel with the alleged extortion issues with Hays.  Upon information and belief, Ostovich, Hafermann, Rothenberg, and others, intended for the public to perceive Mandel as the same person who allegedly extorted Hafermann.

66.     Again, on December 15, 2017, Hafermann filed a temporary restraining order ("TRO Proceedings") against Mandel, by and through an attorney whose offices were one floor below Rothenberg's office in Los Angeles, California.  The documents filed in the TRO Proceedings falsely alleged, in a sworn statement by Hafermann, that:

Mr. Mandel has been following, tracking, and stalking me; he hid recording devices in my phone; he has a private investigator watching me; he threatened violence and to physically hurt me; and he threatened to expect this violence in two (2) hours.

16

67.     Ostovich submitted a sworn statement in support of the initiation of the TRO proceedings to the same effect as the statement by Hafermann.

68.     The TRO Proceedings were filed around two days after Mandel expressed that he never made the false statements and that he was ready to set aside the personal issues with Taylor to continue his and Hafermann's successful business together.

69.     On information and belief, Ostovich, Hafermann, and Rothenberg, or an agent acting on their behalf, provided notice of the TRO Proceedings to entertainment media outlets after they were filed in order to retaliate against Mandel, among other things, for declining to renegotiate the terms of the New Agreement and to justify Mandel's termination, in violation of the New Agreement.

70.     On information and belief, Ostovich, Hafermann, Rothenberg, and others, conspired to publish false statements about Mandel, including to conflate Mandel with the reported extortion by Michael Hays.

71.     Also on December 15, 2017, and in violation of the New Agreement, Hafermann sent a letter of termination to Mandel, by and through Mandel's attorney and Rothenberg's associate.  The letter stated:

> Dear Todd:
>
> We have just been advised that Holly Brook Hafermann p/k/a "Skylar Grey" has elected to terminate her management relationship with Mandel Music Group.
>
> Accordingly, this letter shall constitute formal written notice of such termination, effective immediately.
>
> We apologize for the necessary formality of this letter.

72.     On February 15, 2018, the court held a full evidentiary hearing on the temporary restraining order.

73.     At the conclusion of the evidentiary hearing, the TRO Proceedings were dismissed in Mandel's favor.

### April 17, 2018, Mediation

74.     After Hafermann wrongfully terminated Mandel's employment, she continued to disavow the New Agreement, including by refusing to allow Mandel to act as her manager and refusing to pay income.  On information and belief, Hafermann's dereliction of the New Agreement occurred, at least in part, under the direction of Taylor.

75.     Through his divorce attorney, Mandel sought to resolve issues related to the Decree of Divorce, and he agreed to mediate at Hafermann's request.  On April 17, 2018, the mediation was held in Salt Lake City, Utah.

76.     Ostovich attended the mediation for the purposes of assisting and accessing information related to Mandel's and Hafermann's business accounts.  Unbeknownst to Mandel, while he and Hafermann were in settlement discussions, Ostovich secretly left the mediation and drove her rental car to Mandel's home in Park City, Utah.

77.     On information and belief, Ostovich contacted Mandel's housecleaner and asked her to change her cleaning appointment at Mandel's house to coincide with the mediation, which allowed Ostovich to gain access to the home.

78.     Security camera footage shows Ostovich entering Mandel's home, where she stole Mandel's personal property, including, but not limited to, computer hard drives containing intellectual property and his personal safe.

79.     The intellectual property contained in the stolen hard drives includes hundreds of extremely valuable songs owned by Mandel that were necessary for Mandel to conduct business.

80.     On information and belief, Ostovich stole the property at Hafermann's direction.

## FIRST CAUSE OF ACTION
**Defamation Brought by Mandel Against Hafermann, Ostovich, and Rothenberg**

81.     Mandel hereby incorporates and re-alleges the preceding allegations as though fully set forth herein.

82.     On information and belief, on or around December 12, 2017, Hafermann and Ostovich published false and defamatory statements concerning Mandel to third parties, including entertainment media companies.

83.     Hafermann, Ostovich, and Rothenberg published statements, referring to Mandel by name, falsely stating, among other things, that Mandel threatened to murder Hafermann and Taylor, and was unlawfully recording audio and video inside Hafermann's apartment and her cell phone.

84.     The statements were not privileged including because they were published by Hafermann, Ostovich, and Rothenberg with malice, hatred, ill will, and with the intent to injure Mandel; they were published to persons who had no legally justified reason for receiving the false statements; and/or they were excessively published to more persons than necessary to further the objectives of proposed litigation or to resolve a dispute.

85.     Hafermann's, Ostovich's, and Rothenberg's statements constitute defamation per se because they falsely charged Mandel with criminal conduct and conduct which is incongruous with the exercise of business, trade, profession, or office.

86.     The published statements were made with knowledge of their falsity or with reckless disregard to their falsity.  Such statements have exposed and continue to expose Mandel to contempt, hatred, ridicule, and obloquy.

87.     As a direct and proximate result of the published statements, Mandel has suffered and continues to suffer special and specific damages, including, without limitation, shame, mortification, severe emotional distress, and irreparable harm to Mandel's reputation within the business community, all to his damage in an amount in excess of $300,000 to be determined at trial.

88.     Further, as a direct and proximate result of the published statements, Mandel has lost clients and other business opportunities.

89.     Hafermann's, Ostovich's, and Rothenberg's acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.  Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Hafermann, Ostovich, and Rothenberg and deter such conduct in the future.

## SECOND CAUSE OF ACTION
### False Light Brought by Mandel Against Hafermann, Ostovich, and Rothenberg

90.     Mandel hereby incorporates and re-alleges the preceding allegations as though fully set forth herein.

91.     Hafermann's, Ostovich's, and Rothenberg's defamatory statements concerned Mandel and placed Mandel in a false light, including by falsely accusing Mandel of criminal activities.

92.     The false light in which Mandel was placed by Hafermann's, Ostovich's, and Rothenberg's defamatory statements would be highly offensive to a reasonable person.

93.     The false light in which Mandel was placed by Hafermann's, Ostovich's, and Rothenberg's defamatory statements is highly offensive to Mandel.

94.     The defamatory statements were made with knowledge or with reckless disregard to their falsity and the false light in which they placed Mandel.

95.     As a direct and proximate result of Hafermann's, Ostovich's, and Rothenberg's conduct, Mandel has suffered and continues to suffer general and special damages in an amount in excess of $300,000 to be determined at trial.  Without limitation, the defamatory statements were of such a nature to cause and were intended to cause irreparable damage to Mandel's reputation and lost business opportunities due to the false light in which they placed Mandel.

96.     Hafermann's, Ostovich's, and Rothenberg's acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.  Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Hafermann, Ostovich, and Rothenberg and deter such conduct in the future.

### THIRD CAUSE OF ACTION
**Wrongful Use of Civil Proceedings Brought by Mandel Against Hafermann**

97.     Mandel hereby incorporates and re-alleges the preceding allegations as though fully set forth herein.

98.     Hafermann actively took part in the initiation or procurement of TRO Proceedings against Mandel.

99.     Mandel was innocent of the claims brought against him.

100.    Hafermann did not have probable cause to initiate or procure the TRO Proceedings.

101.    Hafermann initiated or procured the TRO Proceedings primarily for a purpose other than that of bringing Mandel to justice.

102.    The TRO Proceedings were terminated in favor of Mandel.

103.    As a direct and proximate result of Hafermann's conduct, Mandel has suffered and continues to suffer general and special damages in an amount in excess of $300,000 to be determined at trial.  Without limitation, Hafermann directly and proximately caused Mandel severe or extreme emotional distress, loss of income, irreparable damage to Mandel's reputation, and lost business opportunities.

104.    Hafermann's acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.  Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Hafermann and deter such conduct in the future.

## FOURTH CAUSE OF ACTION
### Abuse of Process Brought by Mandel Against Hafermann

105.    Mandel hereby incorporates and re-alleges the preceding allegations as though fully set forth herein.

106.    Hafermann had an ulterior purpose for using the TRO proceedings against Mandel, including, among other things, to oust Mandel from his employment.

22

107.     Hafermann's immediate objective for using the TRO proceedings against Mandel was not legitimate in the use of the process, including, without limitation, willfully and intentionally destroying Mandel's standing in the music industry.

108.     Hafermann acted willfully and intentionally in the use of civil proceedings not proper in the regular prosecution of the proceedings and used of the process in a wrongful manner.

109.     As a direct and proximate result of Hafermann's conduct, Mandel has suffered and continues to suffer general and special damages in an amount in excess of $300,000 to be determined at trial.  Without limitation, Hafermann directly and proximately caused Mandel severe or extreme emotional distress, loss of income, irreparable damage to Mandel's reputation, and lost business opportunities.

110.     Hafermann's acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.  Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Hafermann and deter such conduct in the future.

### FIFTH CAUSE OF ACTION
**Breach of Contract Brought by Mandel Against Hafermann**

111.     Mandel hereby incorporates and re-alleges the preceding allegations as though fully set forth herein.

112.     The New Agreement entered into by Mandel and Hafermann constitutes a valid, binding, and enforceable contract.

113.     Mandel performed his duties and obligations under the New Agreement.

114.    Hafermann wrongfully terminated the New Agreement.

115.    Hafermann materially breached the New Agreement including when she terminated the New Agreement.

116.    As a result of Hafermann's breaches, Mandel has suffered damages in an amount in excess of $300,000 to be determined at trial.

## SIXTH CAUSE OF ACTION
### Promissory Estoppel Brought by Mandel Against Hafermann

117.    Mandel hereby incorporates and re-alleges the preceding allegations as though fully set forth herein.

118.    Hafermann expressly promised to give 20% gross revenue generated by Hafermann and 20% of all earnings from any of Hafermann's songs, work, music, intellectual property, and artistic creations to Mandel.

119.    Acting with prudence and in reasonable reliance on that promise, Mandel, among other things, forfeited a larger share of Hafermann's revenue and earnings from any of Hafermann's songs, work, music, intellectual property, and artistic creations, and Mandel limited the scope of his separate business interests to focus on Hafermann's career.

120.    Hafermann should have reasonably expected her promise would induce Mandel to forfeit a larger share of Hafermann's revenue and earnings from any of Hafermann's songs, work, music, intellectual property, and artistic creations, and induce Mandel to limit the scope of his separate business interests to focus on Hafermann's career.

121.    Hafermann knew that Mandel relied on her promise when he forfeited a larger share of Hafermann's revenue and earnings from any of Hafermann's songs, work, music,

intellectual property, and artistic creations, and limited the scope of his separate business interests.

122.    Hafermann was aware of all material facts.

123.    Mandel relied on Hafermann's promise.

124.    Mandel's reliance on Hafermann's promise damaged him in an amount in excess of $300,000 to be determined at trial.

125.    Hafermann's acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.  Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Hafermann and deter such conduct in the future.

## SEVENTH CAUSE OF ACTION
### Breach of Implied Covenant of Good Faith and Fair Dealing
### Brought by Mandel Against Hafermann

126.    Mandel hereby incorporates and re-alleges the preceding allegations as though fully set forth herein.

127.    The New Agreement contained an unwritten or implied promise that the parties will deal with each other fairly and in good faith.

128.    Thus, Hafermann promised not to intentionally do anything to injure Mandel's right to receive the benefits of the New Agreement.

129.    Hafermann violated this unwritten promise, because her actions were not consistent with the agreed common purpose and justified expectations of Mandel in light of the New Agreement language and the dealings between, and conduct of, the parties.

25

130.    Mandel was injured as a direct and proximate result of Hafermann's violation of this unwritten promise.

### EIGHTH CAUSE OF ACTION
**Wrongful Discharge Brought by Mandel Against Hafermann**

131.    Mandel hereby incorporates and re-alleges the preceding allegations as though fully set forth herein.

132.    A clear and substantial public policy prevents an employer from terminating an employee by, among other things, manufacturing false and defamatory allegations for the purpose of terminating an employment contract.

133.    Hafermann's conduct in manufacturing false and defamatory allegations for the purpose of terminating an employment contract brought that public policy into play.

134.    The termination and Hafermann's conduct bringing the public policy into play are causally linked.

135.    As a direct and proximate result of Hafermann's conduct, Mandel has suffered and continues to suffer general and special damages in an amount in excess of $300,000 to be determined at trial.  Without limitation, Hafermann directly and proximately caused Mandel severe or extreme emotional distress, loss of income, irreparable damage to Mandel's reputation, and lost business opportunities.

136.    In addition, Mandel is entitled to front pay, back-pay, costs, and attorney's fees.

137.    Hafermann's acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.  Accordingly, Mandel is

entitled to an award of punitive damages, in an amount sufficient to punish Hafermann and deter such conduct in the future.

## NINTH CAUSE OF ACTION
### Unjust Enrichment Brought by Mandel Against Hafermann

138.    Mandel hereby incorporates and re-alleges the preceding allegations as though fully set forth herein.

139.    A benefit was conferred upon Hafermann by Mandel's work and labor as Hafermann's manager.

140.    Hafermann knew of the benefit conferred upon her by Mandel's management.

141.    Hafermann's acceptance and retention of the benefits of the services conferred from Mandel would be inequitable under the circumstances, without payment of the value of the benefits to Mandel.  Among other things, Hafermann made representations of payment to Mandel or misleading acts, which arose independent from the New Agreement.

142.    It would be unjust to allow Hafermann to retain the benefits conferred and those benefits must be returned in an amount to be determined at trial.

143.    A constructive trust should be imposed on the assets, property, funds, profits, benefits, opportunities, and/or proceeds of Hafermann and her other ventures (regardless of where, how, when, or to whom such assets, property, funds, profits, benefits, opportunities, and/or proceeds may have been transferred) for the benefit of Mandel.

## TENTH CAUSE OF ACTION
### Alienation of Affections Brought by Mandel Against Taylor

144.    Mandel hereby incorporates and re-alleges the preceding allegations as though fully set forth herein.

145.    Mandel was the lawfully wedded husband of Hafermann to whom he was married for approximately four years prior to the relationship that developed between Hafermann and Taylor.

146.    Taylor acted to willfully and intentionally interfere with the marital relationship of Mandel and Hafermann, causing an alienation of Hafermann's affections toward Mandel.

147.    Taylor acted to willfully and intentionally interfere with the marital relationship of Mandel and Hafermann to the extent that Hafermann abandoned her marriage with Mandel.

148.    In or around December 2016, Taylor became acquainted with Mandel's wife, and Taylor, with actual knowledge of the relationship that existed between Mandel and his wife, began a course of conduct to willfully and deliberately seduce, entice, and alienate the affections of Mandel's wife in Utah, with the intent to further wrongfully and maliciously injure Mandel; thus depriving Mandel of the company, consortium, society, assistance, and services of his wife.

149.    Taylor's efforts to willfully alienate the affections of Mandel's wife from Mandel include, but are not limited to, the following:

a.    Taylor insinuated himself into the relationship of Mandel and Hafermann, using his friendship with them to spend time alone with Hafermann;

b.    Taylor sought to seduce a married woman and repeatedly entice her through the offer of wealth and a lavish lifestyle;

c.    Taylor sought to seduce a married woman and entice her through excessive communication by phone and text message;

d.    Taylor sought to seduce a married woman and entice her through insinuating himself into her business planning and decision-making;

e.    Taylor sought to seduce a married woman and entice her through the offer and performance of a sexual relationship;

f.    Taylor refused to recognize the wrongfulness of his actions and moved in with Hafermann before Mandel was served with a complaint for divorce; and

g.    Taylor held himself out to the community as Hafermann's partner.

150.    On information and belief, Taylor willfully and intentionally encouraged and promoted a sexual relationship with Hafermann while Mandel and Hafermann were married, which interfered with any possible reconciliation of the marriage.

151.    Taylor's acts were the controlling cause of the breakup of the marriage.

152.    As a result of the marital interference by Taylor, Mandel was deprived of the comfort, society, and consortium to which he was entitled by the virtue of marriage.

153.    As a direct and proximate result of Taylor's conduct, Mandel has suffered and continues to suffer general and special damages in an amount in excess of $300,000 to be determined at trial.  Without limitation, Taylor directly and proximately caused Mandel severe or extreme emotional distress including humiliation, anxiety, depression, sleeplessness, and mental anguish.

154.    Taylor's acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.  Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Taylor and deter such conduct in the future.

## ELEVENTH CAUSE OF ACTION
### Conversion Brought by Mandel Against Hafermann and Ostovich

155.     Mandel hereby incorporates and re-alleges the preceding allegations as though fully set forth herein.

156.     On or around April 17, 2018, Hafermann and Ostovich willfully interfered with Mandel's possession and use of property for which he was entitled to immediate possession, by using court proceedings as means to enter Mandel's home without his permission.

157.     Hafermann and Ostovich deprived Mandel of the use and possession of property, including, but not limited to, computer hard drives containing intellectual property that are necessary for Mandel to conduct business.

158.     Hafermann and Ostovich have refused to return or to respond to Mandel's demand to return the stolen property.

159.     No lawful justification exists for Hafermann's and Ostovich's possession of or interference with Mandel's property.

160.     As a direct and proximate result of Hafermann's and Ostovich's conduct, Mandel has suffered and continues to suffer general and special damages in an amount in excess of $300,000 to be determined at trial.  Without limitation, Hafermann and Ostovich directly and proximately caused Mandel severe or extreme emotional distress, loss of income, irreparable damage to Mandel's reputation, and lost business opportunities.

161.     A constructive trust should be imposed on the assets, property, funds, profits, benefits, opportunities, and/or proceeds of Hafermann's, Ostovich's, and their other ventures (regardless of where, how, when, or to whom such assets, property, funds, profits, benefits, opportunities, and/or proceeds may have been transferred) for the benefit of Mandel.

162.     Further, the conduct as alleged in this Complaint demonstrates that Hafermann's and Ostovich's conduct was the result of conscious wrongdoing.  Applying the conscious wrongdoer doctrine, Hafermann and Ostovich should be required to account for and disgorge any and all assets, property, funds, profits, benefits, opportunities, and/or proceeds (regardless of where, how, when, or to whom such assets, property, funds, profits, benefits, opportunities, and/or proceeds may have been transferred) obtained as a result of conversion.

163.     Hafermann's and Ostovich's acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.  Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Hafermann and Ostovich and deter such conduct in the future.

## TWELFTH CAUSE OF ACTION
### Theft Brought by Mandel Against Ostovich and Hafermann

164.     Mandel hereby incorporates and re-alleges the preceding allegations as though fully set forth herein.

165.     In accordance with UTAH CODE ANN. § 76-6-408(1), Mandel asserts that Hafermann and Ostovich are guilty of theft for receiving, retaining, or disposing of the property of another knowing that it has been stolen, or believing that it probably has been stolen, or concealing, selling, withholding or aiding in the concealment, sale, or withholding of property from the owner, knowing the property to be stolen, intending to deprive the owner of it.

166.     As a direct and proximate result of Hafermann's and Ostovich's conduct, Mandel has suffered and continues to suffer general and special damages in an amount in excess of $300,000 to be determined at trial.  Without limitation, Hafermann and Ostovich directly and

proximately caused Mandel severe or extreme emotional distress, loss of income, irreparable

damage to Mandel's reputation, and lost business opportunities.

167.    In accordance with UTAH CODE ANN. § 76-6-412(2), Mandel is entitled to treble

damages to be proven at trial and for costs of suit and reasonable attorney fees.

### THIRTEENTH CAUSE OF ACTION
**Abuse of Process Brought by Mandel Against Hafermann and Ostovich**

168.    Mandel hereby incorporates and re-alleges the preceding allegations as though

fully set forth herein.

169.    Hafermann and Ostovich had an ulterior purpose in the use of proceedings against

Mandel, including, without limitation, to interfere with his real and personal property during the

mediation.

170.    Hafermann's and Ostovich's immediate objective in the use of civil proceedings

against Mandel was not legitimate, including, without limitation, interfering with his real and

personal property during the mediation.

171.    Hafermann and Ostovich acted willfully and intentionally in the use of civil

proceedings not proper in the regular prosecution of the proceedings and used the process in a

wrongful manner.

172.    As a direct and proximate result of Hafermann's and Ostovich's conduct, Mandel

has suffered and continues to suffer general and special damages in an amount in excess of

$300,000 to be determined at trial.  Without limitation, Hafermann and Ostovich directly and

proximately caused Mandel severe or extreme emotional distress, loss of income, irreparable

damage to Mandel's reputation, and lost business opportunities.

173.    Hafermann's and Ostovich's acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others. Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Hafermann and deter such conduct in the future.

### FOURTEENTH CAUSE OF ACTION
**Breach of Fiduciary Duty Brought by Mandel Against Hafermann**

174.    Mandel hereby incorporates and re-alleges the preceding allegations as though fully set forth herein.

175.    Hafermann, as a member, manager, and/or employee of Thunder Bay Touring and/or Psycho Killer Music, owed fiduciary duties to Thunder Bay Touring and/or Psycho Killer Music, and their members, including duties of due care, loyalty, and acting in good faith and honesty.

176.    Hafermann failed to perform her fiduciary duties in good faith and with ordinary prudence by, among other things, deceiving Mandel, stealing valuable intellectual property from Mandel, and failing to have undivided loyalty to Mandel.

177.    Hafermann failed to perform her respective fiduciary duties in good faith and with ordinary prudence by, among other things, knowingly and substantially participating, assisting, and/or encouraging her and Taylor's business interests over Mandel's.

178.    As a direct and proximate result of Hafermann's conduct, Mandel has suffered and continues to suffer damages in an amount in excess of $300,000 to be determined at trial.

179.    Hafermann's acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and

reckless indifference toward, and a disregard of, the rights of others.  Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Hafermann and deter such conduct in the future.

180.    Mandel is entitled to the reasonable attorneys' fees incurred as a result of Hafermann's breaches of her fiduciary duties to Mandel.

181.    Mandel's claim for breach of fiduciary duty arises from duties of care that are separate and distinct from any contractual duty.

**FIFTEENTH CAUSE OF ACTION**
**Breach of Contract Brought by Mandel Against Rothenberg and Rothenberg, P.C.**

182.    Mandel hereby incorporates and re-alleges the preceding allegations as though fully set forth herein.

183.    Mandel and Rothenberg entered into a valid, binding, and enforceable legal services contract.

184.    Mandel performed his duties and obligations under the contract, or he was excused from performing his duties and obligations.

185.    Rothenberg materially breached the contract by not performing his duties and obligations, including by retaliating against Mandel for declining to renegotiate the terms of the New Agreement and to avoid paying Mandel his percentage of any cash advances from record or publishing companies, to wrongfully justify the removal of Mandel in violation of the New Agreement, and/or conflate Mandel with the alleged extortion by Hays.

186.    Rothenberg, P.C., is liable to Mandel for breach of contract because of its own conduct and under principles of vicarious responsibility and respondeat superior for the acts of its agents, including Rothenberg.

187.    As a result of Rothenberg's breaches, Mandel has suffered damages in an amount to be proven at trial.

### SIXTEENTH CAUSE OF ACTION
**Breach of Fiduciary Duty Brought by Mandel Against Rothenberg and Rothenberg, P.C.**

188.    Mandel hereby incorporates and re-alleges the preceding allegations as though fully set forth herein.

189.    Rothenberg was engaged by, or acted as an attorney for, Mandel in the course of Mandel's business.

190.    Rothenberg breached his fiduciary duties to Mandel during his legal representation of Mandel, including by retaliating against Mandel for declining to renegotiate the terms of the New Agreement and to avoid paying Mandel his percentage of any cash advances from record or publishing companies, to wrongfully justify the removal of Mandel in violation of the New Agreement, and/or conflate Mandel with the alleged extortion by Hays.

191.    As a direct and proximate result of Rothenberg's conduct, Mandel has suffered damages and continues to suffer damages in an amount in excess of the jurisdictional limit of this court to be determined at trial.

192.    Rothenberg's acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.  Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Rothenberg and deter such conduct in the future.

193.    Rothenberg, P.C., is liable to Mandel for breach of fiduciary duty because of its own conduct and under principles of vicarious responsibility and respondeat superior for the acts of its agents, including Rothenberg.

194.    Mandel is entitled to the reasonable attorneys' fees incurred as a result of Rothenberg's breaches of his fiduciary duties to Mandel.

### SEVENTEENTH CAUSE OF ACTION
**Intentional Interference with Economic Relations**
**Brought by Mandel Against All Defendants**

195.    Mandel hereby incorporates and re-alleges the preceding allegations as though fully set forth herein.

196.    Mandel had management contracts with Hafermann and third parties.

197.    Mandel had economic relationships with Hafermann and third parties that probably would have resulted in an economic benefit to Mandel.

198.    Defendants knew about Mandel's contracts and economic relationships with Hafermann and third parties.

199.    Hafermann intentionally interfered with Mandel's economic and contractual relations using improper means by, among other things, stealing Mandel's property, publishing defamatory statements concerning Mandel, and wrongfully ousting Mandel from his employment.

200.    Ostovich intentionally interfered with Mandel's economic and contractual relations using improper means, among other things, by stealing Mandel's property and publishing defamatory statements concerning Mandel.

201.    Taylor intentionally interfered with Mandel's economic and contractual relations using improper means, among other things, by alienating the affections of Hafermann.

202.    Rothenberg intentionally interfered with Mandel's economic and contractual relations using improper means, among other things, by directing Hafermann to publish false statements concerning Mandel and directing Hafermann to breach the New Agreement.

203.    Defendants' intentional acts were designed to induce breaches of contract or disruption of the economic and contractual relationships.

204.    Defendants' intentional acts actually induced breaches of contract or disrupted Mandel's economic and contractual relationships.

205.    Defendants acted using improper means to interfere with Mandel's economic relations.

206.    Defendants' disruption and interference with Mandel's economic relations has caused and continues to cause harm to Mandel, or was a substantial factor in causing Mandel harm.

207.    As a direct and proximate result of Defendants' conduct, Mandel has suffered and continues to suffer general and special damages in an amount in excess of $300,000 to be determined at trial.  Without limitation, Defendants directly and proximately caused Mandel severe or extreme emotional distress, loss of income, irreparable damage to Mandel's reputation, and lost business opportunities.

208.    Defendants' acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.  Accordingly, Mandel is

entitled to an award of punitive damages, in an amount sufficient to punish Defendants and deter such conduct in the future.

209.     Rothenberg, P.C., is liable to Mandel for intentional interference with economic relations because of its own conduct and under principles of vicarious responsibility and respondeat superior for the acts of its agents, including Rothenberg.

210.     Mandel's claim for intentional interference with economic relations arises from duties of care that are separate and distinct from any contractual duty.

**EIGHTEENTH CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress**
**Brought by Mandel Against All Defendants**

211.     Mandel hereby incorporates and re-alleges the preceding allegations as though fully set forth herein.

212.     Hafermann engaged in wrongful conduct, among other things, by stealing Mandel's property, publishing defamatory statements concerning Mandel, and wrongfully ousting Mandel from his employment.

213.     Ostovich engaged in wrongful conduct, among other things, by stealing Mandel's property and publishing defamatory statements concerning Mandel.

214.     Taylor engaged in wrongful conduct, among other things, by alienating the affections of Mandel's wife.

215.     Rothenberg engaged in wrongful conduct, among other things, by directing Hafermann to publish false statements and directing Hafermann to breach the New Agreement.

216.     Defendants intended to cause emotional distress or acted with reckless disregard of the probability of causing emotional distress to Mandel.

217.    As a direct and proximate result of Defendants' conduct, Mandel has suffered and continues to suffer general and special damages in an amount in excess of $300,000 to be determined at trial.  Without limitation, Defendants directly and proximately caused Mandel severe or extreme emotional distress including humiliation, anxiety, depression, sleeplessness, and mental anguish.

218.    Defendants' acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.  Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Defendants and deter such conduct in the future.

219.    Rothenberg, P.C., is liable to Mandel for intentional infliction of emotional distress because of its own conduct and under principles of vicarious responsibility and respondeat superior for the acts of its agents, including Rothenberg.

### NINETEENTH CAUSE OF ACTION
**Negligent Infliction of Emotional Distress**
**Brought by Mandel Against All Defendants**

220.    Mandel hereby incorporates and re-alleges the preceding allegations as though fully set forth herein.

221.    Hafermann engaged in wrongful conduct, among other things, by stealing Mandel's property, publishing defamatory statements concerning Mandel, and wrongfully ousting Mandel from his employment.

222.    Ostovich engaged in wrongful conduct, among other things, by stealing Mandel's property and publishing defamatory statements concerning Mandel.

223.     Taylor engaged in wrongful conduct, among other things, by alienating the affections of Mandel's wife.

224.     Rothenberg engaged in wrongful conduct, among other things, by directing Hafermann to publish false statements and directing Hafermann to breach the New Agreement.

225.     Defendants should have realized that their conduct could cause the sort of emotional distress that might result in illness or bodily harm.

226.     Defendants' conduct unintentionally caused Mandel to sustain severe emotional distress, characterized by illness or bodily harm.

227.     As a direct and proximate result of Defendants' conduct, Mandel has suffered and continues to suffer general and special damages in an amount in excess of $300,000 to be determined at trial.

228.     Defendants' acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.  Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Defendants and deter such conduct in the future.

229.     Rothenberg, P.C., is liable to Mandel for negligent infliction of emotional distress because of its own conduct and under principles of vicarious responsibility and respondeat superior for the acts of its agents, including Rothenberg.

### TWENTIETH CAUSE OF ACTION
**Conspiracy Brought by Mandel Against All Defendants**

230.     Mandel hereby incorporates and re-alleges the preceding allegations as though fully set forth herein.

231.   Each of the Defendants combined and formed an agreement with the others to accomplish unlawful and wrongful objectives as set forth in this Complaint.

232.   Each of the Defendants had a meeting of the minds with the others to accomplish unlawful objectives.

233.   Each of the Defendants engaged in one or more unlawful, overt acts.

234.   Hafermann engaged in unlawful conduct, among other things, by stealing Mandel's property, publishing defamatory statements concerning Mandel, and wrongfully ousting Mandel from his employment.

235.   Ostovich engaged in unlawful conduct, among other things, by stealing Mandel's property and publishing defamatory statements concerning Mandel.

236.   On information and belief, Taylor engaged in unlawful conduct, among other things, on information and belief, overtly acting to promote or encourage the publication of defamatory statements concerning Mandel.

237.   On information and belief, Rothenberg engaged in unlawful conduct, among other things, by directing Hafermann to publish false statements and directing Hafermann to breach the New Agreement.

238.   On information and belief, Does engaged in unlawful conduct by publishing defamatory statements concerning Mandel and/or promoting or encouraging the publication of defamatory statements concerning Mandel.

239.   As a direct and proximate result of Defendants' conduct, Mandel has suffered and continues to suffer general and special damages in an amount in excess of $300,000 to be determined at trial.  Without limitation, Defendants directly and proximately caused Mandel

severe or extreme emotional distress, loss of income, irreparable damage to Mandel's reputation, and lost business opportunities.

240.     Defendants' acts and omissions were the result of oppressive conduct, willful and malicious conduct, intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.  Accordingly, Mandel is entitled to an award of punitive damages, in an amount sufficient to punish Defendants and deter such conduct in the future.

241.     Rothenberg, P.C., is liable to Mandel for conspiracy because of its own conduct and under principles of vicarious responsibility and respondeat superior for the acts of its agents, including Rothenberg.

## ELECTION OF DISCOVERY TIER

Because Mandel pleads damages in excess of $300,000, this is a Tier 3 case pursuant to Rule 26(c)(3) of the Utah Rules of Civil Procedure.

## JURY DEMAND

Mandel demands a trial by jury on all matters that may be tried to a jury.

## PRAYER FOR RELIEF

For the reasons stated in this First Amended Complaint, Mandel prays for relief against Defendants as follows:

1.  For economic damages in an amount to be alleged and proven at trial;

2.  For non-economic damages in an amount to be alleged and proven at trial;

3.  For punitive damages in an amount to be alleged and proven at trial;

4.  For an award of attorneys' fees and costs as allowed by law;

5.  For any further relief as the Court deems just and proper, including without

limitation, attorney's fees, costs, pre- and post-judgment interest, and any other

damages recoverable by law.

RESPECTFULLY SUBMITTED this 14th day of June, 2019.

DEISS LAW P.C.

/s/ Andrew G. Deiss
Andrew G. Deiss

*Counsel for Todd Mandel*

Plaintiff's Address:
2962 Westview Trail
Park City, Utah 84098

43