United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TODD MANDEL,<br><br>          Plaintiff,<br><br>     v.<br><br>HOLLY HAFERMANN, et al.,<br><br>          Defendants. | Case No.  20-cv-03668-JSC<br><br>**ORDER RE DEFENDANTS' MOTIONS TO STRIKE AND MOTION TO DISMISS**<br><br>Re: Dkt. Nos. 53, 54, 55 |

Plaintiff in the above-captioned case brings state law claims against Holly Hafermann, Vanessa Ostovich, Elliott Taylor, Paul Rothenberg, and Rothenberg, P.C.  Now before the Court are Defendants' motions to strike pursuant to California Civil Procedure § 425.16, as well as Ms. Hafermann's motion to dismiss Mr. Mandel's claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  After careful consideration of the parties' briefing, and having had the benefit of oral argument on September 24, 2020, the Court GRANTS Ms. Hafermann's motion to strike, GRANTS in part and DENIES in part Mr. Rothenberg's motion to strike, and GRANTS in part and DENIES in part Ms. Hafermann's motion to dismiss.

**BACKGROUND**

I.      **Complaint Allegations**

After being introduced in 2009, Mr. Mandel and Ms. Hafermann married in November 2012.  In 2010, Ms. Hafermann, a professional singer and songwriter, hired Mr. Mandel to be her manager.  The couple agreed that Mr. Mandel would manage Ms. Hafermann in exchange for a percentage of earnings from her performances and intellectual property.  As Ms. Hafermann's career developed, the two formed two limited liability companies, Thunder Bay Touring ("TBT") and Psycho Killer Music ("PKM"), to help manage aspects of Ms. Hafermann's career and business; Mr. Mandel owned 40% of each, and Ms. Hafermann owned the remaining 60%.  Mr.

1   Mandel also formed Mandel Music Group, LLC ("MMC"), of which he was the sole member.  In

2   2012, Mr. Mandel hired Ms. Ostovich as an employee of MMC to act as Ms. Hafermann's

3   personal assistant.  From 2009 to 2017 Mr. Mandel and Ms. Hafermann lived together in Park

4   City, Utah.

5          Mr. Taylor met Ms. Hafermann and Mr. Mandel in 2016, and the three developed a

6   friendship.  After meeting them, Mr. Taylor, a California resident, would visit Mr. Mandel and

7   Ms. Hafermann in Utah.  Sometime between late 2016 and mid-2017 Mr. Taylor and Ms.

8   Hafermann began having an extramarital affair.  In May 2017, Ms. Hafermann moved from the

9   residence she shared with Mr. Mandel in Park City, Utah to St. Helena, California, where she

10  began to live with Mr. Taylor.  On June 12, 2017, Ms. Hafermann filed for divorce to end her

11  marriage with Mr. Mandel.

12         Mr. Rothenberg is an entertainment attorney and the sole owner of Rothenberg, P.C.  At all

13  relevant times, Mr. Mandel alleges that Mr. Rothenberg served as legal counsel for Mr. Mandel,

14  TBT, PKM, and MMC, as well as that Mr. Rothenberg often travelled to Park City, Utah to

15  provide legal counsel to Mr. Mandel.   Mr. Mandel additionally alleges that Mr. Rothenberg

16  provided him with legal counsel during his divorce proceedings with Ms. Hafermann, and that

17  until December 2017 Mr. Rothenberg gave constant legal advice to Mr. Mandel for management

18  and publishing opportunities.

19         On September 26, 2017, Mr. Mandel and Ms. Hafermann settled their divorce in a

20  mediation proceeding conducted in Salt Lake City, Utah.  At the mediation, Mr. Mandel and Ms.

21  Hafermann entered into a stipulation ("Divorce Stipulation") that outlined terms regarding Mr.

22  Mandel's continued employment as Ms. Hafermann's manager, as well as percentages of Ms.

23  Hafermann's revenue to which Mr. Mandel would be entitled.  On November 6, 2017, a Utah state

24  court entered the parties' Decree of Divorce that incorporated the Divorce Stipulation's terms

25  regarding Mr. Mandel's employment and compensation.

26         Following the entry of their Decree of Divorce, on December 5, 2017 Mr. Mandel and Ms.

27  Hafermann met Mr. Rothenberg at his Los Angeles office to discuss business for 2018.  At this

28  meeting, Mr. Rothenberg discussed offers from publishing companies and potential cash advances

2

regarding Ms. Hafermann's work.  He also discussed renegotiating Mr. Mandel's management salary under the terms of the Divorce Stipulation.  Mr. Mandel declined to renegotiate these terms.

On December 13, 2017, Ms. Hafermann, Ms. Ostovich, and Mr. Mandel attended a holiday party organized by Ms. Hafermann's record company.  Mr. Taylor attended the event as well. Shortly after arriving and greeting Ms. Hafermann and Mr. Taylor, Mr. Mandel left the party after Ms. Ostovich offered to drive him to a friend's house.  At approximately 9:46 p.m. that evening, Ms. Hafermann sent Mr. Mandel a text message apologizing for bringing Mr. Taylor to the holiday party.  At approximately 10:52 p.m., Ms. Hafermann sent a second text message in which she asked if Mr. Mandel "threaten[ed] [her] life and [Mr. Taylor's] life and sa[id] we have 2 hours? That's how I took it… you have PI's, cameras in the house, and we have 2 hours."  At approximately 12:08 a.m., Mr. Mandel replied:

> Apology accepted. I do not appreciate you trying to instigate a scene and belittle me in front of our business peers tonight. I think you've had some drinks. I'm not sure why you are bringing hostility into this conversation. No one has threatened anyone. Tomorrow is a new day. I look forward to crushing it together!

On December 15, 2017, Ms. Hafermann initiated proceedings for a temporary restraining order ("TRO") against Mr. Mandel in Los Angeles Superior Court (the "TRO Proceeding").  Ms. Hafermann filed a sworn statement in the TRO Proceeding that Mr. Mandel had been following and stalking her, hiding recording devices in her home, tracking her with a private investigator, and threatening her with violence. Ms. Ostovich additionally submitted a sworn statement in support of Ms. Hafermann's request for a TRO.  That same day, the news site TMZ.com ("TMZ") published an article related to and describing the TRO Ms. Hafermann sought against Mr. Mandel, and Ms. Hafermann sent a letter of termination to Mr. Mandel, ending her management relationship with him and MMG.  Los Angeles Superior Court issued the TRO against Mr. Mandel on December 15, 2017.[1]

Mr. Mandel, believing this termination to be in violation of the Divorce Stipulation's

---

[1] On February 15, 2018, a full evidentiary hearing on the TRO was held in Los Angeles Superior Court and the TRO against Mr. Mandel was dismissed.

United States District Court
Northern District of California

1  terms, agreed to mediation with Ms. Hafermann on April 17, 2018 in Salt Lake City, Utah.  Mr.

2  Mandel alleges that during the course of the mediation, Ms. Ostovich broke into his home where

3  she stole computer hard drives containing intellectual property in the form of songs.

4  **II.     Procedural History**

5         On September 18, 2018, Mr. Mandel filed a complaint against Ms. Hafermann, Ms.

6  Ostovich, Mr. Taylor in the Third Judicial Court, State of Utah ("Utah State Court").  (Dkt. No. 2-

7  1 at 2.)[2]  Mr. Mandel then filed a first amended complaint ("FAC") in Utah State Court, adding

8  Mr. Rothenberg and Rothenberg, P.C. as named defendants and bringing new claims against them.

9  (Dkt. No. 2-1 at 34).  Mr. Rothenberg removed the complaint to the District of Utah on diversity

10  grounds (Dkt. No. 2 at 1), and shortly thereafter moved to dismiss for lack of personal jurisdiction;

11  on that same day Ms. Hafermann, Ms. Ostovich, and Mr. Taylor filed a motion to change venue

12  requesting the case be transferred to this District pursuant to 28 U.S.C. § 1404(a), as well as a

13  Rule 12(b)(6) motion to dismiss.  (Dkt. Nos. 10, 11, & 12.)  Thereafter, the action was transferred

14  to this Court.  (Dkt. No. 40.)  On July 2, 2020, Mr. Rothenberg and Ms. Hafermann filed motions

15  to strike pursuant to California Code of Civil Procedure § 425.16, and Ms. Hafermann filed a Rule

16  12(b)(6) motion to dismiss.  (Dkt. Nos. 53, 54, & 55.)  The motions are fully briefed, and the

17  Court held oral argument on the motions September 24, 2020.[3]

18                              **CHOICE OF LAW**

19         This diversity case was transferred from the District of Utah under 28 U.S.C. § 1404(a); as

20  such, this Court, the transferee court, must apply the choice-of-law rules of Utah, the state in

21  which the transferor court sits.  *See Ferens v. John Deere Co.*, 494 U.S. 516, 519 (1990).   Utah

22  courts apply the "most significant relationship" test set forth in the Restatement (Second) of

23  Conflict of Laws in "determining which state's laws should apply to a given circumstance."

24  *Waddoups v. Amalgamated Sugar Co.*, 54 P.3d 1054, 1059 (Utah 2002).  Under Utah law, "a

25  choice of law analysis is preceded by a determination of whether there is a true conflict between

26  _____

27  [2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers placed at the top of the documents.

28  [3] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).  (Dkt. Nos. 46-50).

the laws of those states that are interested in the dispute." *One Beacon Am. Ins. Co. v. Huntsman Polymers Corp.*, 276 P.3d 1156, 1165 n.10 (1996); *see also Am. Nat. Fire Ins. Co. v. Farmers Ins. Exch.*, 927 P.2d 186, 188 (Utah 1996) ("Indeed, were it not for the 'different rules of local law' on the subject of insurance policy coverage, there would be no [choice-of-law] issue before us."). Where a conflict exists between the laws of interested states, the particular factors considered in determining the "most significant relationship" will "vary according to the type of action brought[.]" *Waddoups*, 54 P.3d at 1059. "If no conflict exists, the court may apply Utah's law regardless of which state has the most significant relationship to the causes of action asserted in the complaint." *Rupp v. Transcon. Ins. Co.*, 627 F. Supp. 2d 1304, 1314 (D. Utah 2008) (citation omitted).

When determining what state has the most significant relationship to a tort case, a court must consider: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Waddoups*, 54 P.3d at 1060 (citing Restatement (Second) Conflict of Laws § 145(2) (1971)). In a contract claim choice-of-law analysis, five factors are considered: (a) the place of contracting, (b) the place of negotiation, (c) the place of performance, (d) where the principal subject of the contract is located, (e) domicile, residence, nationality, place of incorporation, and place of business of the parties. Restatement (Second) of Conflict of Laws § 188 (1971). *See also Salt Lake Toyota Dealers Ass'n v. St. Paul Mercury Ins. Co.*, No. 2:05-CV-497 TS, 2006 WL 1547996, at *3 (D. Utah June 6, 2006) (applying factors set out in the Restatement (Second) Conflict of Laws § 188 to contract dispute where "Utah [was] the forum state").

## DISCUSSION

### I.   Motions to Strike

California Code of Civil Procedure § 425.16, the "anti-SLAPP" statute, "was enacted to allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation." *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001). The anti-SLAPP statute protects an individual's conduct that "aris[es] from any act of that

1    person in furtherance of the person's right of petition or free speech" under the federal or

2    California constitutions, and provides that claims against this conduct "shall be subject to a special

3    motion to strike[.]"  Cal. Civ. Proc. Code § 425.16(b)(1).

4         The statute requires a two-step inquiry.  First, the Court determines whether the defendant

5    has made a prima facie showing that the challenged conduct "aris[es] from conduct in furtherance

6    of the [defendant's] right of petition or free speech . . . in connection with a public issue[.]" Cal.

7    Civ. Proc. Code § 425.16(b)(1); *see also Baral v. Schnitt*, 1 Cal. 5th 376, 384 (2016).  At step one,

8    a court "primarily [reviews] the complaint, but also papers filed in opposition to the motion to the

9    extent that they might give meaning to the words in the complaint." *Dible v. Haight Ashbury Free*

10   *Clinics, Inc.*, 170 Cal. App. 4th 843, 849 (2009); *see also* Cal. Civ. Proc. Code § 425.16(b)(2).

11   Once made, the burden shifts to the plaintiff to show a "reasonable probability of prevailing in its

12   claims for those claims to survive dismissal." *Metabolife*, 264 F.3d at 840 (internal quotation and

13   citations omitted); *see also Baral*, 1 Cal. 5th at 396 ("[T]he burden shifts to the plaintiff to

14   demonstrate that each challenged claim . . . is legally sufficient and factually substantiated.").

15        A federal court sitting in diversity, however, must apply state substantive law and federal

16   law governing procedure.  *See Hanna v. Plumer*, 380 U.S. 460, 473 (1965).  The Ninth Circuit

17   recently addressed the tension California's anti-SLAPP statute presents between state law and

18   federal procedure.  When a defendant files an anti-SLAPP motion in California state court, "[a]ll

19   discovery proceedings in the action" are stayed and the discovery stay "remain[s] in effect until

20   notice of the entry of the order ruling on the motion."  Cal. Code Civ. Proc. § 425.16(g).  In

21   federal court, "[r]equiring a presentation of evidence without accompanying discovery would

22   improperly transform the motion to strike under the anti-SLAPP law into a motion for summary

23   judgment without providing any of the procedural safeguards that have been firmly established by

24   the Federal Rules of Civil Procedure."  *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med.*

25   *Progress*, 890 F.3d 828, 833–34 (9th Cir. 2018).  Countenancing no such "usurp[ation] [of] the

26   federal rules," the Ninth Circuit in *Planned Parenthood* set forth the standard for district courts'

27   evaluation of anti-SLAPP motions: where an anti-SLAPP motion "challenges only the legal

28   sufficiency of a claim, a district should apply the [Rule] 12(b)(6) standard," whereas when an anti-

United States District Court
Northern District of California

SLAPP motion "challenges the factual sufficiency of a claim, then the [Rule] 56 standard will apply." *Id.* at 834.  In a factual challenge, "discovery must be allowed, with opportunities to supplement evidence based on the factual findings, before any decision is made by the court." *Id.*

Where a motion raises both legal and factual challenges, a court applies the anti-SLAPP motion's framework to the defendant's legal challenges in two stages.  First, the court analyzes the defendant's legal challenges; "if any of the plaintiff's claims [do] not survive that analysis, they [are] dismissed as under Rule 12." *Todd v. Lovecruft*, No. 19-CV-01751-DMR, 2020 WL 60199, at *8 (N.D. Cal. Jan. 6, 2020).  Whereas in state court dismissed claims would be stricken without leave to amend, federal procedure requires that a plaintiff who loses an anti-SLAPP motion must have the opportunity to amend the complaint. *See Verizon Delaware, Inc. v. Covad Commc'ns Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004) ("[G]ranting a defendant's anti-SLAPP motion to strike a plaintiff's initial complaint without granting the plaintiff leave to amend would directly collide with Fed. R. Civ. P. 15(a)'s policy favoring liberal amendment.").  At the second stage, after the plaintiff has filed an amended complaint and the parties have conducted discovery as required by *Planned Parenthood*, "the court would address the defendant's factual challenges." *Todd*, 2020 WL 60199, at *8.

**A. Ms. Hafermann**

In light of the governing legal authority, the Court now analyzes the claims Ms. Hafermann seeks to strike in her anti-SLAPP motion: defamation; false light; wrongful use of civil proceedings, or malicious prosecution; and abuse of process.  The Court considers these claims in turn.

**1. Defamation**

**a. Choice of Law**

Under the Restatement's choice-of-law factors, California's anti-SLAPP law applies in Ms. Hafermann's challenge to Mr. Mandel's defamation claim.  While Mr. Mandel suffered injury, at least in part, in Utah where he was domiciled at the time Ms. Hafermann made the allegedly defamatory statements, the conduct causing the injury occurred in California where Ms. Hafermann is domiciled.  The TRO Proceeding was filed in a California court, and Ms.

United States District Court
Northern District of California

7

Hafermann filed her sworn statement containing the allegedly defamatory statements in connection with the TRO Proceeding.  Given that Mr. Mandel's claim is based largely on statements made in connection with the TRO Proceeding, California has the most significant relationship to Mr. Mandel's defamation claim against Ms. Hafermann.

### b.  Anti-SLAPP Step One

At step one, a defendant must make an "initial prima facie showing that the plaintiff's suit arises from" conduct the statute protects.  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1110 (9th Cir. 2003).  The statute protects defendant's statements made "before a . . . judicial proceeding," as well as statements "made in connection with an issue under consideration or review by a . . . judicial body."  Cal. Civ. Proc. Code §§ 425.16(e)(1)-(2).  Ms. Hafermann argues that because Mr. Mandel's defamation claim arises from the TRO Proceeding that her allegedly defamatory statements made during and in connection with the proceedings fall within the ambit of § 425.16(e), and that as such she has met her first step burden.  The Court agrees.

"[S]tatements, writings and pleadings in connection with civil litigation are covered by the anti-SLAPP statute, and [do] not require any showing that the litigated matter concerns a matter of public interest."  *Rohde v. Wolf*, 154 Cal. App. 4th 28, 35 (2007) (citations omitted).[4]  Mr. Mandel alleges in the FAC that the sworn statement Ms. Hafermann filed with the TRO on December 15, 2017 falsely alleged that he had been stalking her, hiding recording devices in her home, and threatening her with violence.[5]  (FAC ¶ 66.)  Because Ms. Hafermann's sworn statement attached to the TRO is a statement connected to litigation that is covered by the anti-SLAPP statute, *see Rohde*, 154 Cal. App. 4th at 35, the allegations contained within it satisfy the statute's first step requirements.

---

[4] Mr. Mandel argues in his opposition that Ms. Hafermann has not met her step one burden because she has failed to show whether the allegedly defamatory statements were related to a public issue. However, the anti-SLAPP statute "*equated* a public issue with the authorized official proceeding to which it connects . . . it is the context or setting itself that makes the issue a public issue[.]" *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1117 (1999) (internal quotations and citations omitted) (original emphasis).  For this reason, and in light of *Rohde*, 154 Cal. App. 4th at 35, Mr. Mandel's argument is unavailing.

[5] Mr. Mandel similarly alleges that Ms. Ostovich submitted a sworn statement in "support of the initiation of the TRO [P]roceeding to the same effect as the statement by [Ms.] Hafermann." (FAC ¶ 67.)

United States District Court
Northern District of California

1    In his opposition, Mr. Mandel argues that his defamation claim is motivated by statements

2    Ms. Hafermann made (1) outside of and unconnected with the TRO Proceeding and (2) before and

3    after the proceeding, and that on these bases Ms. Hafermann has not met her first step burden. He

4    further alleges that Ms. Hafermann published "false and defamatory statements" to media outlets

5    and other third parties.  (FAC ¶ 82.)   Because Ms. Hafermann's audience for these allegedly

6    defamatory statements and statements regarding notice of the TRO Proceeding was not a judicial

7    body, goes Mr. Mandel's argument, the acts giving rise to her liability are not petitioning or

8    speech-related acts under the anti-SLAPP statute.  However, section 425.16(e)(2) protects

9    statements "to persons who are not parties or potential parties to litigation, provided such

10   statements are made 'in connection with' pending or anticipated litigation."  *Neville v. Chudacoff*,

11   160 Cal. App. 4th 1255, 1270 (2008).  Under section 425.16(e)(2), communications in connection

12   with anticipated litigation are considered to be "under consideration or review" by a judicial body

13   where these communications "contain[] no statements of fact concerning [a party] that [are] not

14   based on or related to the allegations that formed the basis of [legal] claims."  *Id.* at 1268; *see also*

15   *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman*, 47 Cal. App. 4th 777, 784 (1996) ("The fact that

16   the communication was made to other private citizens rather than to the official agency does not

17   exclude it from the shelter of the anti-SLAPP suit statute.")

18       Accordingly, the FAC's allegations that Ms. Hafermann provided notice to media outlets

19   regarding the TRO either before or after its filing do not frustrate Ms. Hafermann's ability to

20   satisfy her step one burden.  *See Neville*, 160 Cal. App. 4th at 1280.  Ms. Hafermann has satisfied

21   her burden of showing that her conduct is protected under the anti-SLAPP statute, and has

22   therefore satisfied her burden at this stage of the anti-SLAPP inquiry.

23                          **c.   Anti-SLAPP Step Two**

24       Ms. Hafermann asserts that Mr. Mandel cannot prevail at step two of the anti-SLAPP

25   inquiry because the litigation privilege applies to her conduct. Where a defendant's "second-step

26   argument is not that [a plaintiff] has insufficient facts or evidence" but that the claim is not

27   viable—at least in part—"as a matter of law because it is based upon conduct that . . . is clearly

28   protected by California's litigation privilege," *Ekorus, Inc. v. Elohim EPF USA, Inc.*, No. CV 20-

United States District Court
Northern District of California

310-GW-GJSX, 2020 WL 3891449, at *4 (C.D. Cal. Apr. 24, 2020), it is appropriate for the Court

to apply a Rule 12(b)(6) standard in evaluating claims the defendant argues are barred by the

litigation privilege.  *See also McGarry v. Univ. of San Diego*, 154 Cal. App. 4th 97, 108 (2007)

("In [the second step], the plaintiff must show . . . that the claim is *legally sufficient* . . . .  In

making this assessment, the court must . . . examine whether there are any constitutional or

nonconstitutional defenses to the pleaded claims[.]") (internal citations omitted) (emphasis added).

      The litigation privilege is an affirmative defense; Ms. Hafermann bears the burden of

showing it applies to her conduct.  *See Laker v. Bd. of Trustees of California State Univ.,* 32 Cal.

App. 5th 745, 769 (2019) (holding that defendants bear the burden of proof when asserting an

affirmative defense in the context of an anti-SLAPP motion). The privilege applies to "any

communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other

participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some

connection or logical relation to the action."  *Silberg v. Anderson*, 50 Cal. 3d 205, 212 (1990), *as

modified* (Mar. 12, 1990) (citations omitted).  "If the challenged action falls within the litigation

privilege, the trial court should grant an anti-SLAPP motion to strike."  *Laker*, 32 Cal. App. 5th at

769; *see also Bergstein v. Stroock & Stroock & Lavan LLP*, 236 Cal. App. 4th 793, 814 (2015)

("A plaintiff cannot establish a probability of prevailing if the litigation privilege precludes the

defendant's liability on the claim.").  It reaches "testimony in court and statements made in

pleadings," as well as "documents submitted in connection with motions."  *Optional Capital, Inc.

v. Akin Gump Strauss, Hauer & Feld LLP*, 18 Cal. App. 5th 95, 116-118 (2017).  Ms. Hafermann

argues that because Mr. Mandel's defamation claim is based on conduct associated with her

efforts to seek and documents filed in support of the TRO Proceeding that she has met her burden

of showing the privilege applies, *see Optional Capital*, 18 Cal. App. 5th at 116-118, and

accordingly that Mr. Mandel's defamation claim does not survive her anti-SLAPP motion.  The

Court agrees.

      Mr. Mandel counters that the claim survives because it is based on press releases issued

prior to Ms. Hafermann's filing of the request for a protective order.  For this reason, Mr. Mandel

contends, the litigation privilege does not protect Ms. Hafermann's conduct because the privilege

does not reach "publication[s] to the general public through the press." *GetFugu, Inc. v. Patton Boggs LLP*, 220 Cal. App. 4th 141, 153 (2013) (internal quotations and citations omitted). This argument, however, is unsupported by the FAC's allegations. Mr. Mandel alleges elsewhere in the FAC, for instance, that the sworn statement Ms. Hafermann submitted in the TRO Proceeding made false allegations against him. (FAC ¶ 66.) Moreover, the FAC makes no allegation that Ms. Hafermann made any publication herself through TMZ or other media outlets regarding the TRO. Paragraph 64 of the FAC cites the TMZ news story, which itself simply cites legal documents affiliated with the TRO Proceeding. Elsewhere in the FAC, Mr. Mandel alleges that Ms. Hafermann provided media outlets with notice of the TRO Proceeding after it was initiated. (FAC ¶ 69.) At most the FAC alleges that Ms. Hafermann provided notice of the TRO Proceeding to media outlets and non-parties—it does not allege that Ms. Hafermann made any defamatory statements herself outside of the TRO Proceeding or in papers filed in connection with it.

On this basis, the Court concludes that Ms. Hafermann has met her burden of showing the litigation privilege applies to her conduct. Accordingly, applying the Rule 12(b)(6) standard to its second-step analysis, *see Planned Parenthood*, 890 F.3d at 834, and reading the FAC in the light most favorable to Mr. Mandel, *see Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1159 (9th Cir. 2012), Mr. Mandel has failed to show that he has a probability of prevailing on his defamation claim. *See also Bergstein*, 236 Cal. App. 4th at 814 ("A plaintiff cannot establish a probability of prevailing if the litigation privilege precludes the defendant's liability on the claim."). The claim is thus dismissed with leave to amend. *See Verizon Delaware*, 377 F. 3d at 1091; *Todd*, 2020 WL 60199, at *8.

### 2.  False Light

"[A] false light action is in substance equivalent to a defamation suit." *Cannon v. City of Petaluma*, No. C 11-0651 PJH, 2011 WL 3267714, at *3 (N.D. Cal. July 29, 2011) (citation omitted). In his opposition, Mr. Mandel argues that the gravamen of both claims is Ms. Hafermann's allegedly defamatory statements made to news outlets before filing the TRO. (Dkt. No. 73 at 25.) Indeed, Mr. Mandel makes no additional factual allegations in the FAC regarding

United States District Court
Northern District of California

1    his false light claim that distinguish it from his defamation claim; his false light allegations are no

2    more than "legal conclusion[s] couched as [] factual allegation[s]" that the court is not bound to

3    accept, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  (FAC ¶¶ 90-96.)  For these reasons,

4    the choice-of-law analysis is the same as with Mr. Mandel's defamation claim, and California law

5    applies.

6          As such, for substantially the same reasons that Mr. Mandel's defamation claim fails under

7    the California anti-SLAPP inquiry, so too does his false light claim against Ms. Hafermann.  At

8    step one, her conduct in connection to the TRO Proceeding is protected under the anti-SLAPP

9    statute. At step two, she has met her burden to show the litigation privilege applies, and Mr.

10   Mandel has alleged no facts in the FAC—and made no additional factual allegations regarding his

11   false light claim—to demonstrate she made defamatory statements outside the TRO proceeding

12   that would otherwise show that Ms. Hafermann has not met her burden regarding the litigation

13   privilege's applicability.  Therefore, Mr. Mandel's false light claim is dismissed with leave to

14   amend.  *See Verizon Delaware*, 377 F. 3d at 1091, *Todd*, 2020 WL 60199, at *8.

### 3.  Abuse of Process—California

#### a.  Choice of Law

17         Ms. Hafermann moves to strike Mr. Mandel's fourth cause of action for abuse of process.[6]

18   Abuse of process claims are subject to the anti-SLAPP statute where the claim "arises out of

19   [plaintiff's] filing the underlying action." *Booker v. Rountree*, 155 Cal. App. 4th 1366, 1370

20   (2007). "The theory of recovery, and the essence of the claim, is [] that the underlying litigation

21   was conducted in an improper manner." *Id.* at 1370-71.

22         California has the most significant relationship to Mr. Mandel's abuse of process claim for

23   substantially the same reason that California has the most significant relationship to Mr. Mandel's

24   defamation claim against Ms. Hafermann.  The FAC's allegations regarding the claim focus on the

25   TRO Proceeding.  (FAC ¶¶ 106-07.)  The FAC's allegation that the TRO Proceeding was initiated

26

27

28
_____

[6] In her reply, Ms. Hafermann withdrew Mr. Mandel's claim for abuse of process related to the Utah divorce mediation from her anti-SLAPP motion.  (Dkt. No. 76 at 2.)  Therefore, the Court considers only Mr. Mandel's abuse of process claim that arises from the TRO Proceedings.

1    to injure Mr. Mandel's "standing" in the music industry suggests that the injury caused by Ms.

2    Hafermann's conduct would be felt in California, where Mr. Mandel kept many industry contacts

3    and maintained many relationships, in addition to his home in Park City, Utah. Furthermore, Ms.

4    Hafermann resided in California at the time of the TRO's filing, and the conduct giving rise to the

5    injury on which the claim is based—submitting the allegedly defamatory statements in connection

6    to the proceeding and initiating it—occurred in California. Therefore, California anti-SLAPP law

7    applies to this Court's analysis of Mr. Mandel's abuse of process claim.

8                            **b.   Anti-SLAPP Step One**

9          Ms. Hafermann argues that, as with Mr. Mandel's claims for defamation and false light,

10   her conduct is protected by the anti-SLAPP statute and that she has met her burden at step one of

11   the anti-SLAPP inquiry. Mr. Mandel's argument to the contrary is familiar: the claim is not the

12   TRO process, but rather what Ms. Hafermann did before and after that process. (Dkt. No. 73 at

13   26.) For the reasons discussed in this Court's analysis of Mr. Mandel's defamation claim, Ms.

14   Hafermann has met her burden of showing that the conduct at issue in Mr. Mandel's abuse of

15   process claim is protected under the anti-SLAPP statute. Because Mr. Mandel seeks to impose

16   liability under his abuse of process claim for conduct related to her efforts to secure a TRO in Los

17   Angeles Superior Court, it is protected activity under the anti-SLAPP statute.

18                            **c.   Anti-SLAPP Step Two**

19         Ms. Hafermann argues, as above, that the litigation privilege shields her conduct and that,

20   as a result, Mr. Mandel cannot meet his burden under the second step inquiry. *See Bergstein*, 236

21   Cal. App. 4th at 814. Mr. Mandel counters that statements made during the course or in

22   relationship to the TRO Proceeding are not essential to prove his abuse of process claim and that,

23   moreover, the claim is based on information released regarding the subject matter of the protective

24   order prior to Ms. Hafermann filing for it. (Dkt. No. 73 at 29.) The FAC's allegations, however,

25   do not support this argument. Furthermore, under the FAC's cause of action for abuse of process,

26   Mr. Mandel makes no additional allegations to support this theory. (FAC ¶¶ 105-108.)

27   Accordingly, for the reasons set out above, Ms. Hafermann has met her burden in showing that the

28   litigation privilege applies to the conduct underpinning Mr. Mandel's abuse of process claim, and

United States District Court
Northern District of California

1    that Mr. Mandel's contrary argument regarding statements made outside of and before the TRO

2    Proceeding are unsupported by the FAC as pleaded and the relevant legal authority.

3         Accordingly, Mr. Mandel's abuse of process claim is dismissed with leave to amend. *See*

4    *Verizon Delaware*, 377 F. 3d at 1091, *Todd*, 2020 WL 60199, at *8.

5              **4.  Wrongful Prosecution**

6         The analysis as to the abuse of process claim applies equally to Mr. Mandel's claim for

7    wrongful prosecution against Ms. Hafermann. Claims for malicious prosecution fall "within the

8    purview of the anti-SLAPP statute." *Jarrow Formulas, Inc. v. LaMarche*, 31 Cal. 4th 728, 735

9    (2003). The choice-of-law analysis compels the same conclusion regarding the application of

10   California's anti-SLAPP law; Mr. Mandel's malicious prosecution claim is based on the same

11   factual allegations, and in fact makes *additional* allegations regarding Ms. Hafermann's initiation

12   of the TRO Proceeding. (FAC ¶¶ 98-101.) Mr. Mandel argues that Ms. Hafermann's liability for

13   each claim emerges from the same conduct—her abuse of the process to "petition the courts."

14   (Dkt. No. 73 at 26.) Because California's anti-SLAPP law applies, and because the claims are

15   based on the same allegations, Mr. Mandel's claim for malicious prosecution is likewise dismissed

16   with leave to amend.

17        **B. Mr. Rothenberg**

18        Mr. Rothenberg moves to strike the 8 claims for defamation, false light, breach of contract,

19   breach of fiduciary duty, intentional interference with economic relations, intentional infliction

20   with emotional distress, negligent infliction of emotional distress, and conspiracy that Mr. Mandel

21   brings against him.[7] The Court considers them in turn.

22             **1.  Defamation**

23                 **a.  Choice of Law**

24        California has the most significant relationship to the defamation claim against Mr.

25   _____

26   [7] Mr. Rothenberg files his motion on behalf of Defendant Rothenberg, P.C. as well. (Dkt. No. 53
     at 2.) The Court does not separately address factual allegations against Rothenberg, P.C. for two

27   reasons: (1) the FAC's claims that Rothenberg P.C. is liable for "its own conduct" is a naked
     assertion this Court "is not bound to accept," *see Twombly*, 550 U.S. at 570, and (2) the FAC's

28   remaining mention of Rothenberg, P.C. concerns its vicarious liability for Mr. Rothenberg's
     conduct, not allegations on which its own liability could be independently established.

United States District Court
Northern District of California

Rothenberg and therefore the California anti-SLAPP law applies.  Mr. Mandel alleges in the FAC that his defamation claim against Mr. Rothenberg arises from statements Mr. Rothenberg published with Ms. Hafermann and Ms. Ostovich that "falsely stat[ed]" Mr. Mandel threatened to murder Ms. Hafermann and Mr. Taylor.  (FAC ¶ 83.)  Mr. Mandel also alleges that Mr. Rothenberg, along with Ms. Hafermann and Ms. Ostovich, provided TMZ with notice of the TRO proceeding and that this was motivated by a desire to retaliate against Mr. Mandel for "declining to renegotiate the terms of the [Divorce Stipulation] and to justify Mr. Mandel's termination[.]" (FAC ¶¶ 63, 69.)  Mr. Mandel further alleges that Mr. Rothenberg "direct[ed] [Ms.] Hafermann to publish false statements" about him.  (FAC ¶ 202.)

California is the place where the conduct causing the injury occurred—Mr. Rothenberg resided in California, and it was in California that he allegedly published the false statements and provided notice to TMZ regarding the TRO Proceeding. Moreover, the statements concern in part actions that occurred within California—for instance, Mr. Mandel recording Ms. Hafermann in her California residence.  Whereas Mr. Mandel is domiciled in Utah, Mr. Rothenberg is domiciled in Los Angeles, California.  (FAC ¶¶ 1, 5-6.)  The FAC does not specify where the relationship between the two was centered, and instead states that both Mr. Mandel and Mr. Rothenberg traveled between California and Utah to visit one another in professional capacities.  However, at all relevant times Mr. Rothenberg's law office was located in Los Angeles.  Given that Mr. Mandel alleges that the defamatory statements were made in California—notwithstanding Mr. Mandel's domicile in Utah—California law applies to its analysis of Mr. Mandel's defamation claim.

### b.  Anti-SLAPP Step One

Mr. Mandel's claim arises from allegations that Mr. Rothenberg directed Ms. Hafermann to file the TRO, Mr. Rothenberg himself notified news outlets about the TRO Proceeding, and that Mr. Rothenberg conspired with other defendants to publish false statements about Mr. Mandel. (FAC ¶¶ 63, 69-70, 202.)  Mr. Rothenberg argues that he has met his step one burden because this conduct is "protected litigation activity" under the anti-SLAPP statute.  (Dkt. No. 53 at 21.)  The Court agrees.

15

United States District Court
Northern District of California

1    Regarding Mr. Mandel's allegation that Mr. Rothenberg directed Ms. Hafermann to file the

2    TRO and its allegedly defamatory statements, "legal advice and settlement made in connection

3    with litigation are within section 425.16, and may protect defendant attorneys from . . . cause[s] of

4    action 'arising from' those protected activities." *Thayer v. Kabateck Brown Kellner LLP*, 207 Cal.

5    App. 4th 141, 154 (2012), *as modified* (June 22, 2012) (citation omitted); *see also Cabral v.*

6    *Martins*, 177 Cal. App. 4th 471, 480 (2009) ("[A]ll communicative acts performed by attorneys as

7    part of their representation of a client in a judicial proceeding or other petitioning context are *per*

8    *se* protected as petitioning activity by the anti-SLAPP statute.") (citation omitted).  Regarding Mr.

9    Mandel's remaining allegations, statements to a news publication related to judicial proceedings

10   qualify for section 425.16(e)(2)'s protection.  *See Haight Ashbury Free Clinics, Inc. v. Happening*

11   *House Ventures*, 184 Cal. App. 4th 1539, 1549 (2010) ("[Appellant's] statements to the newspaper

12   are within the scope of subdivision (e)(2) of section 425.16, as a 'written or oral statement or

13   writing made in connection with an issue under consideration or review by a ... judicial body[.]'").

14   Mr. Mandel counters that his claims against Mr. Rothenberg do not arise from protected

15   activity because they arise instead from Mr. Rothenberg's breach of a fiduciary duty, and that

16   "simply alleging that [Mr.] Rothenberg breached an attorney-client relationship is sufficient to

17   defeat [the motion] at prong one."  (Dkt. No. 71 at 24-25.)  Incorrect.  The gravamen of Mr.

18   Mandel's argument is that his making a breach of fiduciary duty claim somehow dispenses with

19   the anti-SLAPP step one analysis for his other claims.  However, the Court must consider each

20   claim individually, as well as the specific allegations supporting each individual claim.  *See*

21   *Navellier v. Sletten*, 29 Cal. 4th 82, 89 (2002) ("In the anti-SLAPP context, the critical

22   consideration is whether *the cause of action* is *based on* the defendant's protected free speech or

23   petitioning activity.") (citation omitted) (original emphasis and emphasis added).

24   Mr. Rothenberg has met his first step burden of showing that his activity is protected under

25   the anti-SLAPP statute.

26   **c.  Anti-SLAPP Step Two**

27   Mr. Rothenberg argues—and has the burden of establishing—that the litigation privilege

28   applies to his challenged conduct, and that therefore Mr. Mandel cannot establish a probability of

1    success under the anti-SLAPP second step inquiry.

2         The privilege extends to "any communication that bears some relation to any ongoing or

3    anticipated lawsuit," and an attorney's act of counseling his or her client is covered, "even if it is

4    alleged that the attorney made misrepresentations during the course of such communications."

5    *Flores v. Emerich & Fike*, 416 F. Supp. 2d 885, 900 (E.D. Cal. 2006) (internal quotations and

6    citations omitted); *see also Bergstein*, 236 Cal. App. 4th at 815 (holding  that "communicative

7    activities of counsel" fell within the litigation privilege where they "were made in or in

8    anticipation of judicial proceedings" to achieve "the objects of the litigation and had some

9    connection or logical relation to the litigation") (internal quotations and citation omitted).

10   Therefore, statements Mr. Rothenberg made to Ms. Hafermann regarding the TRO and the TRO

11   Proceeding fall within the litigation privilege.

12        Mr. Mandel's argument that the litigation privilege does not apply to statements made to

13   the media, and that therefore it does not apply to statements Mr. Rothenberg allegedly made to

14   TMZ and other outlets, is unavailing.  Mr. Mandel cites *Silberg*, 50 Cal. 3d at 219, for the

15   proposition that "[r]epublications to nonparticipants in the action are generally not privileged[.]"

16   However, the FAC makes no mention of a "republication" at all—at most, it alleges that Mr.

17   Rothenberg provided *notice* to TMZ about the TRO Proceeding.  FAC ¶¶ 63, 69. Taking the

18   FAC's allegations as true and construing them in the light most favorable to Mr. Mandel, *see*

19   *Davis*, 691 F.3d at 1159, the Court cannot read into the FAC what Mr. Mandel failed to plead.

20        Accordingly, Mr. Rothenberg has met his burden of establishing that the litigation

21   privilege applies to his conduct.[8]  Therefore, Mr. Mandel's defamation claim against Mr.

22   Rothenberg is dismissed with leave to amend.  *See Verizon Delaware*, 377 F. 3d at 1091; *Todd*,

23   2020 WL 60199, at *8.

24

25

26   _____

27   [8] Mr. Rothenberg also argues the fair reporting privilege applies to his conduct and that, on this
     additional basis, Mr. Mandel cannot meet his burden at the second step inquiry.  (Dkt. No. 53 at
     26-27.)  However, because the litigation privilege applies to the conduct motivating Mr. Mandel's

28   defamation claim as pleaded, the Court need not and declines to address Mr. Rothenberg's fair
     reporting privilege argument.

United States District Court
Northern District of California

1

2

#### 2.  False Light

As with his false light claim against Ms. Hafermann, Mr. Mandel's false light claim against Mr. Rothenberg is predicated on the same factual allegations, and he makes no additional factual allegations in the FAC regarding his false light claim to distinguish it from his defamation claim.  For these reasons, the choice-of-law analysis is the same for Mr. Mandel's false light claim against Mr. Rothenberg as it was for his defamation claim, and California law applies.

As with the defamation claim, at step one of the anti-SLAPP inquiry Mr. Rothenberg has met his burden of showing that the conduct at issue is protected litigation activity.  At step two, Mr. Rothenberg has met his burden of showing the litigation privilege applies, and—without any additional factual allegations in the FAC to enhance or distinguish Mr. Mandel's false light claim from his defamation claim against Mr. Rothenberg—in light of this Mr. Mandel has not met his own burden at step two of showing a probability of prevailing on his false light claim under the anti-SLAPP statute.[9]   Therefore, Mr. Mandel's false light claim is dismissed with leave to amend. *See Verizon Delaware*, 377 F. 3d at 1091, *Todd*, 2020 WL 60199, at *8.

#### 3.  Breach of Contract

##### a.  Choice-of-Law

Mr. Mandel brings a breach of contract claim against Mr. Rothenberg on the basis that Mr. Rothenberg breached an agreement to provide legal services when he retaliated against Mr. Mandel for refusing to renegotiate the terms of the Divorce Stipulation.  (FAC ¶¶ 183-85.)  While "there is [no] true conflict" between claims for breach of contract in Utah and California, *One Beacon*., 276 P.3d at 1165 n.10, this does not dispense with the choice-of-law analysis on Mr. Rothenberg's motion to strike because the Court must determine which state's anti-SLAPP law applies.

The FAC does not allege where the parties contracted or negotiated Mr. Rothenberg's performance of legal services for Mr. Mandel—at most, the FAC alleges that the parties entered into a contract that Mr. Rothenberg breached.  (FAC ¶¶ 183-85.)  The FAC does allege, however,

---

[9] As with the defamation claim, the Court need not consider Mr. Rothenberg's argument that the fair reporting privilege also applies to his conduct motivating Mr. Mandel's false light claim.

1   that Mr. Rothenberg travelled periodically to Utah to see Mr. Mandel and provide "legal

2   counsel[,]" and that in July 2017 Mr. Rothenberg flew to Utah to meet with Mr. Mandel and

3   discuss his ownership interests in TBT and PKM.  (*Id.* ¶¶ 38-39.)  Conversely, it was Mr. Mandel

4   who travelled in December 2017 to Mr. Rothenberg's office in Los Angeles with Ms. Hafermann

5   for a meeting during which Mr. Rothenberg discussed business for 2018, and allegedly attempted

6   to renegotiate the Divorce Stipulation's terms with Mr. Mandel.  (*Id.* ¶¶ 44-47.)  Taking the FAC's

7   allegations as true, the periodic performance of Mr. Rothenberg's legal services in Utah does little

8   to illuminate which state holds the most significant relationship to Mr. Mandel's claim.  *See*

9   Restatement (Second) Conflict of Laws § 188 ("The place of performance can bear little weight in

10   the choice of applicable law when . . . performance by a party is to be divided more or less equally

11   among two or more states[.]").

12        The FAC alleges that Mr. Rothenberg is domiciled in Los Angeles, California, and that his

13   office where he conducts business is located in Los Angeles as well.  (FAC ¶¶ 5, 44.)  Therefore,

14   absent FAC allegations regarding the specific place of contracting or negotiation, or which state

15   was the primary place of performance for Mr. Rothenberg's legal services, the allegations

16   regarding Mr. Rothenberg's domicile—as well as the location of his office in Los Angeles, where

17   he performed legal services for Mr. Mandel—support a finding that California has the most

18   significant relationship to Mr. Mandel's claim.  Accordingly, the Court applies California's anti-

19   SLAPP statute in evaluating Mr. Mandel's breach of contract claim.

20                        b.   **Anti-SLAPP Step One**

21        A defendant may challenge a breach of contract claim under California's anti-SLAPP

22   statute.  *See Midland Pac. Bldg. Corp. v. King*, 157 Cal. App. 4th 264, 272 (2007) (citation

23   omitted).  As with other claims, at step one of the anti-SLAPP inquiry a defendant must show that

24   the conduct alleged to constitute the breach of contract arises from "constitutionally protected

25   speech or petitioning."  *Id.* (citation omitted).  Mr. Rothenberg argues that, as with Mr. Mandel's

26   defamation and false light claims, his conduct arises from "protected litigation activity" that falls

27   within section 425.16(e)(2)'s protections.  Not so.

28        Unlike Mr. Mandel's defamation and false light claims, the gravamen of his claim for

United States District Court
Northern District of California

1    breach of contract concerns Mr. Rothenberg's legal advice regarding Mr. Mandel's business

2    interests.  (Dkt. No. 71 at 26.)  Mr. Mandel alleges that both he and Mr. Rothenberg understood

3    Mr. Rothenberg to be Mr. Mandel's attorney, and that in this role he provided legal advice to Mr.

4    Mandel regarding MMG as well.  (FAC ¶ 37.)  Mr. Mandel alleges that Mr. Rothenberg breached

5    the parties' alleged contract for legal services when Mr. Rothenberg "retaliat[ed] against [Mr.]

6    Mandel for declining to negotiate the terms of the [Divorce Stipulation] and to avoid paying [Mr.]

7    Mandel his percentage of any cash advances from record or publishing companies," and that Mr.

8    Rothenberg breached their agreement in order to "wrongfully justify the removal of [Mr.] Mandel"

9    and "conflate" Ms. Hafermann's allegations against Mr. Mandel with those of her ex-boyfriend,

10   Mr. Hays.  (FAC ¶ 185.)

11          The Court is unable to conclude that the breach of contract claim arises from protected

12   activity because the FAC does not allege what Mr. Rothenberg did to retaliate —Mr. Mandel only

13   alleges the motives Mr. Rothenberg had for retaliating, in some form, against Mr. Mandel and

14   consequentially breaching their alleged agreement.  Without additional allegations regarding *how*

15   Mr. Rothenberg retaliated against Mr. Mandel, the Court cannot determine if that retaliatory

16   conduct is protected by the anti-SLAPP statute, and thus whether Mr. Rothenberg has met his step

17   one burden.  In light of Mr. Mandel's claim as currently and imprecisely pleaded, Mr. Rothenberg

18   has not met his burden at step one of the anti-SLAPP inquiry of showing that the conduct

19   motivating Mr. Mandel's claim is protected under the statute.

20                    **4.  Breach of Fiduciary Duty**

21                         **a.  Choice of Law**

22          The factual allegations underlying Mr. Mandel's breach of fiduciary duty claim are the

23   same as those underlying his breach of contract claim.  (FAC ¶ 190.)  Given the claims are

24   supported by the same factual allegations, the choice of law analysis is the same and, as a result,

25   the California anti-SLAPP law applies to Mr. Mandel's breach of fiduciary duty claim against Mr.

26   Rothenberg.

27                         **b.  Anti-SLAPP Step One**

28          Mr. Mandel's breach of fiduciary duty claim is predicated on the same conduct as his

United States District Court
Northern District of California

20

breach of contract claim, and suffers the same deficiency: the claims' animating conduct is allegedly retaliatory, but does not specify how Mr. Rothenberg retaliated against Mr. Mandel. (FAC ¶ 190.)  For substantially the same reasons Mr. Rothenberg failed to meet his step one burden in challenging Mr. Mandel's breach of contract claim, he has failed to meet that burden with regard to Mr. Mandel's claim for breach of fiduciary duty.  As such, the Court need not address Mr. Mandel's showing at the inquiry's second step.

### 5.  Intentional Infliction of Emotional Distress

#### a.  Choice-of-Law

Regarding Mr. Mandel's intentional infliction of emotional distress ("IIED") claim, the FAC alleges that Mr. Rothenberg directed Ms. Hafermann to "publish false statements" in connection to the TRO Proceeding and "direct[ed] her to breach the [Divorce Stipulation.]"  (FAC ¶ 215.)  Thus, the FAC provides that the conduct causing Mr. Mandel's injury occurred in California—Mr. Rothenberg's domicile.  The FAC fails to specify where exactly Mr. Mandel's injury occurred, if anywhere beyond his Utah residence; as such, the Court's choice-of-law analysis mirrors its analysis for Mr. Mandel's defamation claim. Given that Mr. Mandel alleges that the defamatory statements were made in California and that the TRO Proceeding was conducted in California—notwithstanding Mr. Mandel's domicile in Utah—California law applies toMandel's IIED claim.

#### b.  Anti-SLAPP Step One

IIED claims are subject to anti-SLAPP motions in California.  *See Hill v. City of El Segundo*, 33 F. App'x 254, 258 (9th Cir. 2002).  Mr. Mandel bases his claim on the directions Mr. Rothenberg allegedly provided Ms. Hafermann to publish false statements in connection with the TRO Proceeding and to breach the Divorce Stipulation.  (FAC ¶ 215.)

"[L]egal advice and settlement made in connection with litigation are within section 425.16, and may protect defendant attorneys from . . . cause[s] of action 'arising from' those protected activities." *Thayer*, 207 Cal. App. 4th at 154 (citation omitted); *see also Cabral*, 177 Cal. App. 4th at 480 ("[A]ll communicative acts performed by attorneys as part of their representation of a client in a judicial proceeding or other petitioning context are *per se* protected

United States District Court
Northern District of California

1    as petitioning activity by the anti-SLAPP statute.") (citation omitted).  Thus, any "directions" Mr.

2    Rothenberg provided Ms. Hafermann in connection with the allegedly "false statements" she made

3    in connection with the TRO Proceeding are protected under the anti-SLAPP statute.

4         However, statements directing Ms. Hafermann to breach the Divorce Stipulation *after* it

5    was finalized and incorporated into the Divorce Decree do not enjoy protection under the anti-

6    SLAPP statute.  Section 425.16 "does not accord anti-SLAPP protection to suits arising from *any*

7    act having any connection, however remote, with an official proceeding," such as the divorce

8    settlement between Ms. Hafermann and Mr. Mandel.  *Neville*, 160 Cal. App. 4th at 1264 (internal

9    quotations and citation omitted).  "The statements or writings in question must occur in connection

10   with an issue *under consideration or review* in the proceeding." *Id.* (emphasis added).  In *Paul v.*

11   *Friedman*, 95 Cal. App. 4th 853, 866-68 (2002), for example, an attorney's investigations into a

12   security broker's personal life were not protected under the anti-SLAPP statute because they had

13   no bearing on the underlying legal issue of alleged securities fraud that the parties formally

14   arbitrated.  *Id.*  There, "the intrusive pre-hearing investigation of [the plaintiff's] personal life

15   [was] unrelated to any issue under consideration in the arbitration.  In short, it is insufficient to

16   assert that the acts alleged were 'in connection with' an official proceeding . . . .  There must be a

17   connection with an issue *under review* in that proceeding."  *Id.* at 867 (emphasis added).

18        Here, drawing all inferences in Mr. Mandel's favor, and given the FAC's barebones

19   allegations, there is similarly no connection between the directions Mr. Rothenberg allegedly

20   offered Ms. Hafermann to breach the finalized Divorce Stipulation and any issues regarding its

21   terms that were mediated or negotiated during the divorce settlement.  Put differently, while Mr.

22   Rothenberg's alleged directions relate to the Divorce Stipulation—and, by extension, are

23   connected to the divorce settlement process that concluded in September 2017—these statements

24   cannot be connected to an issue *under review* in the settlement proceeding because the proceeding

25   had concluded at the time Mr. Rothenberg gave the alleged directions.  There were no "issues

26   under review" to which Mr. Rothenberg's statements could be connected under the anti-SLAPP

27   statute because there was no longer a divorce proceeding during which the parties were reviewing

28   or deliberating any issues.  As such, Mr. Rothenberg has not met his burden of providing that his

1   alleged statements and directions regarding Ms. Hafermann and the Divorce Stipulation's breach

2   are not protected under the anti-SLAPP statute.

3          "When relief is sought based on allegations of both protected and unprotected activity, the

4   unprotected activity is disregarded at this stage. If the court determines that relief is sought based

5   on allegations arising from activity protected by the statute, the second step is reached." *Baral*, 1

6   Cal. 5th at 396; *see also Pinnacle Ventures LLC v. Bertelsmann Educ. Servs. LLC*, No. 18-CV-

7   03412-BLF, 2020 WL 1082764, at *3 (N.D. Cal. Mar. 6, 2020) ("[W]here a plaintiff's claims are

8   mixed [a court] must disregard allegations based on unprotected activity and proceed to step two

9   of the analysis with respect to allegations based on protected activity." Accordingly—because Mr.

10  Mandel's IIED claim against Mr. Rothenberg is based in part on protected activity—the Court

11  proceeds to step two of the anti-SLAPP inquiry.

12                                    **c.   Anti-SLAPP Step Two**

13         Mr. Rothenberg asserts that the litigation privilege protects the statements he made to Ms.

14  Hafermann in connection to the TRO Proceeding and that, as such, Mr. Mandel cannot meet his

15  step two burden. (Dkt. No. 53 at 25-26.)

16         For substantially the same reason that Mr. Rothenberg met his burden in showing that the

17  litigation privilege applies to the alleged conduct motivating Mr. Mandel's defamation claim, Mr.

18  Rothenberg has met his burden of showing that the litigation privilege applies to the statements at

19  issue in Mr. Mandel's IIED claim.  The privilege applies to "any communication that bears some

20  relation to any ongoing or anticipated lawsuit," and an attorney's act of counseling his or her client

21  is covered, "even if it is alleged that the attorney made misrepresentations during the course of

22  such communications." *Flores*, 416 F. Supp. 2d at 900 (internal quotations and citations omitted);

23  *see also Bergstein*, 236 Cal. App. 4th at 815 (holding that "communicative activities of counsel"

24  fell within the litigation privilege where they "were made in or in anticipation of judicial

25  proceedings" to achieve "the objects of the litigation and had some connection or logical relation

26  to the litigation") (internal quotations and citation omitted).  Therefore, statements Mr. Rothenberg

27  made to Ms. Hafermann regarding the TRO and the TRO Proceeding fall within the litigation

28  privilege.  Mr. Mandel's argument that the litigation privilege is inapplicable because the

United States District Court
Northern District of California

23

1    "gravamen" of the claims is an attorney's breach of professional duties fails for the simple reason

2    that it misreads the FAC's unambiguous language: the IIED claim is based on Mr. Rothenberg

3    "directing [Ms.] Hafermann to publish false statements and directing [her] to breach the [Divorce

4    Stipulation.]"  (FAC ¶ 215.)

5          Because the litigation privilege protects Mr. Rothenberg's statements to Ms. Hafermann

6    regarding the TRO Proceedings, Mr. Mandel has not shown at this step that his IIED claim is

7    "legally sufficient."  *Baral*, 1 Cal. 5th at 396; *see also Ekorus, Inc.*, 2020 WL 3891449, at *4

8    (where the defendant's second step argument is that a plaintiff's claim fails as a matter of law

9    because it is based on conduct "protected by California's litigation privilege" it is appropriate for

10   federal courts to apply a Rule 12(b)(6) standard in evaluating those claims).  Accordingly, Mr.

11   Mandel's IIED claim against Mr. Rothenberg is dismissed with leave to amend.  *See Verizon*

12   *Delaware*, 377 F. 3d at 1091, *Todd*, 2020 WL 60199, at *8.

                **6.   Remaining Claims**

13

14         Mr. Mandel's claims for intentional inference with economic relations, negligent infliction

15   of emotional distress, and conspiracy are based on the same factual allegations as the IIED claim.

16   (FAC ¶¶ 202, 224, 237.)  As Mr. Mandel alleges no additional facts for any of these claims that

17   would otherwise distinguish them from the IIED claim—they are dismissed pursuant to the anti-

18   SLAPP statute with leave to amend for the same reason that the Court dismisses Mr. Mandel's

19   IIED claim with leave to amend.

20   **II.   Motion to Dismiss**

21         Ms. Hafermann, Ms. Ostovich and Mr. Taylor move to dismiss Mr. Mandel's remaining

22   claims for abuse of process regarding the Utah mediation, breach of contract, promissory estoppel,

23   breach of implied covenant of good faith and fair dealing, wrongful discharge, unjust enrichment,

24   alienation of affection, conversion, theft, breach of fiduciary duty, intentional interference with

25   economic relations, intentional infliction of emotional distress, negligent infliction of emotional

26   distress, and conspiracy to the extent the claim is pleaded against them. The Court considers these

27   claims below.

28

United States District Court
Northern District of California

### A.  Breach of Contract and Related Claims

#### 1.  Choice-of-Law

Mr. Mandel brings one breach of contract claim against Ms. Hafermann for terminating the provisions of the Divorce Decree under which the parties agreed Mr. Mandel would be employed as Ms. Hafermann's manager following their divorce.  (FAC ¶¶ 111-116.)

The substantive law governing breach of contract claims in California and Utah is identical.  Under Utah law, "the elements of a breach of contract claim are '(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages.'"  *Christensen v. Mid-Century Ins. Co*., No. 2:19-CV-00164, 2020 WL 619437, at *2 (D. Utah Feb. 10, 2020) (quoting *Am. W. Bank Members, L.C. v. State*, 342 P.3d 224, 230 (2014)).  Similarly, in California the claim's essential elements are "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff."  *Coles v. Glaser*, 2 Cal. App. 5th 384, 391 (2016) (internal quotations and citations omitted).  Given that a breach of contract claim is substantively identical under California and Utah law, no choice-of-law issue exist.  The Court need not determine which state has the most significant relationship to Mr. Mandel's claim and may apply Utah law.  *See One Beacon*, 276 P.3d at 1165 n.10; *see also Rupp*, 627 F. Supp. at 1314 (D. Utah 2008).

#### 2.  Claims

Mr. Mandel alleges that the Divorce Stipulation is an enforceable contract with Ms. Hafermann whose terms Ms. Hafermann breached.  (FAC ¶¶ 112, 115.)  These allegations—and Mr. Mandel's arguments in his opposition—incorrectly characterize the Divorce Stipulation as a contract between the parties.

On November 6, 2017, the Divorce Stipulation was incorporated into the parties' Divorce Decree.[10]  (Dkt. No. 55-7 at 4-5 ¶ 12.)  In this way the Divorce Stipulation became part of a court

---

[10] The Court grants Ms. Hafermann's request and takes judicial notice of the Divorce Decree and the Utah State Court's order on Mr. Mandel's motion for order to show cause.  *See Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (noting that judicial notice is appropriate for "undisputed matters of public record, including documents on file in federal or state courts.") (internal citation omitted).

1   order that was later vacated by the Utah State Court on November 1, 2018.  (Dkt. No. 55-8 at 2.)

2   The court's November 1, 2018 order makes clear that the terms of the Divorce Stipulation were

3   "set aside" from the parties' Divorce Decree and that, moreover, it was the court that vacated the

4   Divorce Stipulation's terms.

5          Fundamentally, the Divorce Stipulation was part of the Divorce Decree, a court order,

6   rather than a contract between Ms. Hafermann and Mr. Mandel.  A plaintiff may not "disguis[e]

7   the true nature of a [domestic relations] action by claiming that [it is] a claim for damages based

8   on a breach of contract."  *Wyttenbach v. Parrish*, 496 F. App'x 796, 797 (10th Cir. 2012) (internal

9   quotation marks and citation omitted).  Where a plaintiff alleges that a defendant breached

10  "obligations under [a court order] negotiated in and supervised by a state court[,]" the breach—

11  and the court order on which it is based—does not "sound in contract" and is a matter to be

12  resolved in state court.  *Id.*

13         The Divorce Stipulation is not a contract.  It is a court order; in fact, Mr. Mandel filed a

14  Motion for Order to Show Cause in Utah State Court regarding Ms. Hafermann's performance

15  under the Divorce Stipulation, the consequence of which was the vacation of the Divorce

16  Stipulation's terms from the Divorce Decree.  (Dkt No. 55-8 at 2.)  Mr. Mandel's theory that that

17  Stipulation is a contract that is enforceable separate from the Divorce Decree would render the

18  Utah State Court's modification of the Divorce Decree a nullity and thus makes no sense. The

19  Court thus dismisses Mr. Mandel's breach of contract claim against Ms. Hafermann.

20         Mr. Mandel's claims for promissory estoppel, unjust enrichment, and breach of the implied

21  covenant of good faith and fair dealing are dismissed for the same reason: they are based on

22  alleged violations of a court order, rather than a contract between the parties.  To the extent that

23  Mr. Mandel's claim for wrongful discharge relies on the Divorce Stipulation's terms, it is also

24  dismissed.

25         The dismissal of these claims is with leave to amend should Mr. Mandel be able to plead a

26  claim that is not based on a breach of the Divorce Stipulation that was incorporated into the

27  Divorce Decree.

28

United States District Court
Northern District of California

1

**B. Abuse of Process—Utah**

2

**1. Choice-of-Law**

3

  The choice-of-law analysis regarding Mr. Mandel's abuse of process claim for the parties'

4

April 18, 2018 mediation is straightforward.  The mediation occurred in Utah, the alleged actions

5

in connection to the mediation occurred in Utah, Mr. Mandel is domiciled in Utah, and the parties'

6

marriage was centered in Utah.  Therefore, Utah law applies to Mr. Mandel's second abuse of

7

process claim.

8

  **2. Claim**

9

  Mr. Mandel alleges that Ms. Hafermann and Ms. Ostovich had an "ulterior purpose" in the

10

use of the Utah mediation against Mr. Mandel, and that the mediation's objective was interference

11

with his real and personal property.  (FAC ¶¶ 169-171.)

12

  To establish a claim for abuse of process under Utah law, a plaintiff must show "an ulterior

13

purpose [and] an act in the use of the process not proper in the regular prosecution of the

14

proceedings." *Anderson Dev. Co. v. Tobias*, 116 P.3d 323, 341 (2005) (internal quotations and

15

citation omitted).  If the legal process "is used for its proper and intended purpose, the mere fact

16

that it has some other collateral effect does not constitute abuse of process." *Hatch v. Davis*, 2004

17

102 P.3d 774, 782 (2006) (internal quotations and citation omitted).  "[T]here is no action for

18

abuse of process when the process is used for the purpose for which it is intended, but there is an

19

incidental motive of spite or an ulterior purpose of benefit to the defendant."  *World Enterprises v.*

20

*Aquila, Inc.*, No. 2:12-CV-00021-DN, 2013 WL 4592204, at *7 (D. Utah Aug. 28, 2013) (internal

21

quotation and citation omitted).

22

  Here, the parties do not dispute that the mediation was court-ordered.  (Dkt. Nos. 55-1 at

23

15, 72 at 20.)   Ms. Hafermann argues that there can be no "improper purpose" to the mediation

24

because her purpose in attending was compliance with a court order.  The Court agrees.

25

Moreover, the FAC makes no allegations regarding any improper purpose in Ms. Hafermann's use

26

of the mediation proceeding.  While the FAC alleges that Ms. Hafermann and Ms. Ostovich had

27

an "ulterior purpose" in using the mediation to interfere with Mr. Mandel's property, where the

28

process is used for "the purpose for which it is intended" there is no cognizable claim even if a

United States District Court
Northern District of California

defendant has an "ulterior purpose of benefit[.]" *World Enterprises*, 2013 WL 4592204, at *7. The FAC alleges that Ms. Ostovich contacted Mr. Mandel's housecleaner and asked her to change a cleaning appointment to "coincide" with the mediation; however, this allegation does not change the undisputed fact that the mediation was itself used for its intended purpose. *See Hatch*, 2004 102 P.3d at 782. In fact, the FAC alleges that Ms. Ostovich "attended the mediation for the purposes of assisting and accessing information related" to the parties' "business accounts." (FAC ¶ 76.) This allegation belies any argument that the mediation itself—notwithstanding other allegations regarding theft or conversion—was not used for its intended purpose.

Mr. Mandel nonetheless argues that his claim survives dismissal because the court-ordered process was one through which Ms. Hafermann and Ms. Ostovich "willfully stole" his property. (Dkt. No. 72 at 20.) This, however, has no bearing on the legitimacy of the mediation itself. Accordingly, Mr. Mandel's claim for abuse of process is dismissed with leave to amend.

### C. Theft & Conversion

#### a. Choice-of-Law

Both Mr. Mandel's claims for theft and conversion concern Ms. Hafermann and Ms. Ostovich's alleged theft of his hard drives during the April 17, 2018 Utah mediation. Here, Mr. Mandel's injury occurred in Utah, as well as the conduct causing the injury—his home was in Park City, where Ms. Hafermann and Ms. Ostovich allegedly stole the hard drives. While Ms. Ostovich and Ms. Hafermann are California residents, Mr. Mandel is a resident of Utah, and in this particular instance the relationship between Ms. Ostovich, Ms. Hafermann, and Mr. Mandel was centered in Utah, where the mediation during which the alleged theft occurred and which they all jointly attended. Accordingly, Utah law governs this Court's analysis of Mr. Mandel's theft and conversion claims.

#### b. Claims

The gravamen of Mr. Mandel's conversion and theft claims is the same: Ms. Hafermann and Ms. Ostovich deprived Mr. Mandel the use of his property including his computer hard drives containing valuable intellectual property in the form of songs. (FAC ¶¶ 157, 165.) Under Utah law, "[a] conversion is an act of willful interference with a chattel, done without lawful

28

justification by which the person entitled thereto is deprived of its use and possession." *Lawrence v. Intermountain, Inc*., 243 P.3d 508, 514 (2010) (internal quotation and citation omitted).

Ms. Hafermann argues that Mr. Mandel's claim for conversion fails as a matter of law because "to the extent that [a plaintiff] alleges conversion of intangible property, such as techniques and information, its claims fail." *Margae, Inc. v. Clear Link Techs*., LLC, 620 F. Supp. 2d 1284, 1287 (D. Utah 2009).  However, this mischaracterizes the nature of Mr. Mandel's conversion claim; he is not alleging the conversion of intangible intellectual property, but the conversion of a physical hard drive on which intellectual property was stored.  (FAC ¶ 79.) Physical materials on which intellectual property is held or imprinted are permissible subjects of conversion claims.  *See id.* at 1288 ("Of course, a handwritten original copy of the song or a recorded version of the song could be converted. But the song itself could not.").

Regarding Mr. Mandel's theft claim, "a person commits theft if the person receives, retains, or disposes of the property of another knowing that the property is stolen, or believing that the property is probably stolen, or who conceals, sells, withholds, or aids in concealing, selling, or withholding the property from the owner, knowing or believing the property to be stolen, intending to deprive the owner of the property."  Utah Code Ann. § 76-6-408(2).  The statute applies in civil actions.  *See Preventive Energy Sols., LLC v. nCap Ventures 5 LLC*, No. 2:16-CV-809-PMW, 2017 WL 87028, at *9 (D. Utah Jan. 10, 2017).  Section 76-6-408 applies "whether a person is found in possession or control of other property stolen on a separate occasion . . . regardless of whether the property is stolen and retained or stolen then received by another." *Id.* (citation omitted).  "Property" is broadly defined, and includes "tangible and intangible personal property[.]"  Utah Code Ann. § 76-6-401(1).

Given the FAC's allegation that Ms. Ostovich and Ms. Hafermann stole Mr. Mandel's physical hard drives, in her reply Ms. Hafermann concedes that a claim for conversion and theft of the hard drives has been pleaded in the FAC.  These claims survive Ms. Hafermann's motion to dismiss.

D. **Alienation of Affection**

Mr. Mandel sues Mr. Taylor in the tenth cause of action for alienation of affection.

### 1.  Choice-of-Law

Utah's "most significant relationship" test applies to analyses of claims for alienation of affection.[11]  *See Williams v. Jeffs*, 57 P.3d 232, 236 (2002).  California does not recognize a claim for alienation of affection.  *See Smith v. Pust*, 19 Cal. App. 4th 263, 269 (1993).

Turning to the relevant choice-of-law factors, the injury occurred in Utah, where Mr. Mandel lived while Mr. Taylor and Ms. Hafermann conducted their extramarital affair and where Ms. Hafermann ultimately divorced Mr. Mandel.  (*Id.* ¶¶ 25, 28.)  *See Williams*, 57 P.3d at 236 (determining that under the "most significant relationship test" that Arizona was "situs of the marriage" and state where the plaintiff felt injury because it was where "he would have experienced the alienation of his wife's affections").

Regarding the conduct causing Mr. Mandel's injury, the FAC alleges that Mr. Taylor had "conversations" with Ms. Hafermann in which he encouraged her to end her marriage, but the FAC does not specify whether these conversations occurred during his trips to Utah, virtually over text message, or in Mr. Taylor's St. Helena, California recording studio.  (FAC ¶ 25.)  It is these conversations that Mr. Mandel alleges "poison[ed]" Ms. Hafermann's affections, as well as her extramarital affair whose place of occurrence the FAC similarly fails to allege.  (*Id.* ¶¶ 25, 27.)  The FAC makes general allegations that Mr. Taylor's Utah visits "started" his campaign to end Ms. Hafermann's marriage, but provide no specific allegations regarding where any conduct that caused Mr. Mandel's injury occurred.  (*Id.* ¶ 25.)  Given the allegation as to the start of the campaign in Utah, the FAC supports a slight inference that at least some of the complained-of conduct occurred in Utah.  *See Williams*, 57 P.3d at 236 (determining that conduct causing the plaintiff's injury occurred in Utah because it was the state where the plaintiff alleged his wife sought counsel from religious leaders who encouraged her divorce).

---

[11] Ms. Hafermann argues that the Restatement (Second) Conflict of Laws § 154, Interference With Marriage Relationship (1971), controls the choice-of-law analysis.  However, Utah courts have adopted section 145's most significant relationship test in analyzing the tort.  Nonetheless, under section 154 "the answer to the [choice-of-law] question will depend upon whether some other state has a greater interest in the determination of the particular issue than the state where the defendant's conduct principally occurred."  *Id.* cmt. b. (citing Restatement (Second) Conflict of Laws § 145 cmts. c-d.).

United States District Court
Northern District of California

1    Under the third factor, Mr. Mandel and Ms. Hafferman were domiciled in Utah during Mr.

2    Taylor's alleged misconduct. While Mr. Taylor resides in California, the formerly married

3    couple's domicile "is the more relevant situs." *Id.* (internal quotation and citation omitted).

4    Relatedly, Mr. Mandel and Ms. Hafferman's marital relationship was centered in Utah. *See id.*

5    Accordingly, Utah law applies to Mr. Mandel's alienation of affection claim.

6    **2. Claim**

7    To make out a claim for alienation of affection, a plaintiff must establish: "(a) the fact of

8    marriage, (b) that the defendant willfully and intentionally, (c) alienated the wife's affections, (d)

9    resulting in the loss of the comfort, society and consortium of the wife, and (e) (to justify punitive

10   damages) a charge of malice." *Plott v. Advanced Comfort Techs., Inc*., No. 1:18-CV-00048-TC,

11   2019 WL 1453062, at *5 (D. Utah Apr. 2, 2019) (internal quotations and citation omitted).

12   Mr. Taylor argues that Mr. Mandel's claim for alienation of affection fails because the

13   choice-of-law analysis is dispositive and that Mr. Mandel did not plead sufficient facts to show

14   that any of Mr. Taylor's conduct occurred in Utah and that, therefore, Utah law should apply.  He

15   additionally argues that applying Utah law would violate the "fundamental principle of comity"

16   because advancements in social acceptance of alternatives to traditional marriage "provide a

17   substantial basis to conclude that Utah would no longer recognize the tort."  (Dkt. No. 55-1 at 21.)

18   Mr. Taylor, however, cites no case in support of this contention.

19   In a footnote Mr. Taylor asks that if the motion to dismiss is denied that the Court order a

20   more definite statement as to the alienation claim.  Under Rule 12(e), "[a] party may move for a

21   more definite statement of a pleading . . . [when that pleading] is so vague or ambiguous that the

22   party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). "Typically, such motions are

23   disfavored in light of the liberal pleading standard, and should not be granted unless the defendant

24   cannot frame a responsive pleading." *Mou v. SSC San Jose Operating Co. LP*, 415 F. Supp. 3d

25   918, 924 (N.D. Cal. 2019) (internal quotation marks and citation omitted).  Mr. Taylor has not met

26   this standard.  If Mr. Taylor's lament is that Mr. Mandel's complaint lacks sufficient factual

27   allegations to plausibly support an inference that Mr. Taylor is liable, he should have made such

28   argument in his 12(b)(6) motion.  But he did not.  The motion to dismiss the alienation of

Case 3:20-cv-03668-JSC   Document 94   Filed 11/30/20   Page 32 of 44

affections claim is therefore denied.

### E. Breach of Fiduciary Duty

Mr. Mandel alleges that Ms. Hafermann "as a member, manager, and/or employee of Thunder Bay Touring and/or Psycho Killer Music" owed fiduciary duties to Thunder Bay Touring and/or Psycho Killer Music, both limited liability companies.  (FAC ¶ 175.)

#### a.  Choice-of-Law

There is no conflict between the laws of California and Utah governing breach of fiduciary duty claims.  To make out a claim, each state requires a plaintiff to show that a defendant owed a duty, breached that duty, and that a plaintiff suffered damages caused by the breach.  *See Giles v. Mineral Res. Int'l, Inc.*, 338 P.3d 825, 827 (Utah Ct. App. 2014); *IIG Wireless, Inc. v. Yi*, 22 Cal. App. 5th 630, 646 (2018) (internal citation omitted).  Because there is no difference in the laws of each state governing claims for breach of fiduciary duty, a choice-of-law analysis is unnecessary and the Court may apply Utah law.

#### b.  Claim

Mr. Mandel does not plausibly allege that Ms. Hafferman owed Mr. Mandel a fiduciary duty.  He alleges that she owed a fiduciary duty to TBT and/or PKM—not to Mr. Mandel.  (FAC 175.)  If she was an employee, how could she possibility owe a fiduciary duty to those companies or Mr. Mandel?  Further, what was the intellectual property she allegedly stole and how did she steal the property?   Mr. Mandel's claim is dismissed with leave to amend.

### F.  Intentional Interference with Economic Relations

Ms. Hafermann, Ms. Ostovich, and Mr. Taylor move to dismiss Mr. Mandel's claims for intentional interference with economic relations ("IIER"). The Court considers them in turn.

#### 1.  Ms. Hafermann

##### a.  Choice-of-Law

The allegations on which Mr. Mandel's IIER claim against Ms. Hafermann are based include Ms. Hafermann's theft of Mr. Mandel's property, publishing defamatory statements against him, and wrongfully terminating him.  (FAC ¶ 199.)  As previously discussed, allegations regarding Ms. Hafermann's theft and conversion support the application of Utah law to Mr.

United States District Court
Northern District of California

32

Mandel's IIER claim.  Regarding the other allegations, Mr. Mandel's employment agreement was ostensibly performed in both states, making the location of his injury less significant in determining which state's law applies.  *See* Restatement (Second) of Conflict of Laws § 145 cmt. e ("When the injury occurred in two or more states, or when the place of injury cannot be ascertained or is fortuitous . . . the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law.").  Here, Ms. Hafermann's defamatory statements and decision to terminate Mr. Mandel's employment were made in California.

In sum, Ms. Hafermann's alleged conversion occurred in Utah, her defamation and termination decisions in California.  Thus, the injuries Mr. Mandel experienced occurred in two different states, making the place his intangible, economic injury occurred less important in the choice-of-law analysis.  *See* Restatement (Second) of Conflict of Laws § 145 cmt. e ("In the case of *personal injuries or of injuries to tangible things*, the place where the injury occurred is a contact that . . .  plays an important role in the selection of the state of the applicable law[.]") (emphasis added).

Ms. Hafermann was also domiciled in California at all relevant times, and the nature of the parties' contacts with both Utah and California makes the factor regarding the parties' domicile less weighty in determining which state's laws should apply under section 145's factors.  *See* Restatement (Second) of Conflict of Laws § 145 cmt. e (stating that, regarding the domicile of the parties, that "importance of these contacts depends largely upon the extent to which they are grouped with other contacts").  In light of these factors, the Court does not find where the parties' relationship was centered a particularly heavy factor in its analysis.  *Id.*  ("On *rare occasions*, the place where the relationship is centered may be the most important contact of all with respect to most issues.") (emphasis added).

Therefore, given that as currently alleged 2 of the 3 injury-causing allegations occurred in California, the Court determines that California has the most significant relationship to Mr. Mandel's IIER claim.

United States District Court
Northern District of California

United States District Court
Northern District of California

#### b.  Claim

In California, the elements for an IIER claim are: "(1) the existence, between the plaintiff and some third party, of an economic relationship that contains the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentionally wrongful acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm proximately caused by the defendant's action." *Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*, 2 Cal. 5th 505, 512 (2017).  Defendants move to dismiss on the grounds that Mr. Mandel has not alleged any intentional wrong acts separate from the interference itself.  *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1153-54 (2003).  The Court agrees.  The FAC does not identify the conduct which allegedly constitutes the interference; nor does Mr. Mandel's opposition.  Mr. Mandel's argument that the FAC's defamation allegations are alone sufficient to satisfy the elements for an IIER claim is unavailing because the allegedly defamatory conduct is protected by California's litigation privilege and cannot, for this reason, constitute a "wrongful act[]" the claim requires a plaintiff to establish.  *Roy Allan*, 2 Cal. 5th at 512; *see also Laffer v. Levinson, Miller, Jacobs & Phillips*, 34 Cal. App. 4th 117, 122 (1995) (holding that the litigation privilege is a defense to claims for intentional interference with economic relations) (citation omitted).

Accordingly, Mr. Mandel's IIER claim against Ms. Hafermann is dismissed with leave to amend.

#### 2.  Ms. Ostovich

##### a.  Choice-of-Law

For substantially the same reasons as the claim against Ms. Hafermann, the Court determines that California has the most significant relationship to Mr. Mandel's IIER claim against Ms. Ostovich.  She is a California resident.  (FAC ¶ 3.)  Mr. Mandel alleges only two incidents that give rise to his IIER claim against her—her theft of his hard drives and publishing defamatory statements against him in connection to the TRO Proceeding.  This conduct occurred in California and Utah.  Furthermore, the FAC does not establish that, with regard to Mr. Mandel's reputational injury or his injury as a prospective manager for other musicians, his injury

occurred solely in Utah.  Mr. Mandel's opposition even states that Defendants' defamatory comments were designed to destroy his reputation in the broader "music industry and public." (Dkt. No. 72 at 21.)  While Mr. Mandel hired Ms. Ostovich as an employee of MMC in Utah, the two worked together in California, and jointly attended the December 13, 2017 holiday party hosted by Ms. Hafermann's record company—an event Mr. Mandel describes as an "important networking event" where he would ostensibly conduct or discuss business with California-based contacts—after which Ms. Ostovich gave Mr. Mandel a ride to a friend's home.  (FAC ¶ 48, 53, 56.)  In circumstances where defamation may occur in multiple states, "there may be little in logic or persuasiveness to say that one state rather than another is the place of injury, or when . . . injury has occurred in two states."  Restatement (Second) of Conflict of Laws § 145 (1971) cmt. e.  For these reasons, California has the most significant relationship to the claim.

### b.  Claim

Having determined that California law governs Mr. Mandel's IIER claim against Ms. Ostovich, it is dismissed without prejudice.  To the extent that Mr. Mandel's claim is based on Ms. Ostovich's allegedly defamatory statements made in connection with the TRO Proceeding, these are privileged and cannot serve as the basis for an IIER claim.  *See Laffer*, 34 Cal. App. 4th at 122. The allegation that Ms. Ostovich intentionally interfered with Mr. Mandel's economic relations by "stealing [his] property" (FAC ¶ 200) is likewise insufficient to sustain an IIER claim because the FAC does not plausibly support an inference that the theft was "designed to disrupt" an unidentified economic relationship or economic relationships.  *Korea Supply Co.*, 29 Cal. 4th at 1154.

### 3.  Mr. Taylor

### a.  Choice-of-Law

Mr. Mandel alleges that Mr. Taylor intentionally interfered with his economic relations by alienating his affections.  (FAC ¶ 201.)  The Court determines that, for the same reasons that Utah had the most significant relationship to Mandel's alienations of affections claim against Mr. Taylor, that Utah has the most significant relationship to his IIER claim.

1          **b.  Claim**

2          Under Utah law, a plaintiff must show the following elements to make out an IIER claim:

3   "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic

4   relations, (2) by improper means, (3) causing injury to the plaintiff."  *Davidson v. Baird*, 438 P.3d

5   928, 945 (2019) (internal quotations and citation omitted).

6          The FAC is inadequately pleaded for Mr. Mandel's IIER claim against Mr. Taylor to

7   survive at the motion to dismiss stage.  Mr. Mandel alleges that Mr. Taylor intentionally interfered

8   with Mr. Mandel's economic relations by alienating the affections of Ms. Hafermann.  (FAC ¶

9   201.)  However, this conclusory allegation does not demonstrate how Mr. Taylor's conduct caused

10  any harm to Mr. Mandel's unidentified economic relations.  Accordingly, Mr. Mandel has failed

11  to satisfy the elements required for IIER claims under Utah law, *see Davidson*, 438 P.3d at 945,

12  and is dismissed with leave to amend.

13         **G.  Intentional Infliction of Emotional Distress**

14         Mr. Mandel brings claims for intentional infliction of emotional distress ("IIED") against

15  all Defendants.  The factual allegations motivating these claims are the same as those motivating

16  his IIER claims.  (FAC ¶¶ 199-202, 212-215.)  After conducting its choice-of-law analysis, the

17  Court considers these claims against each Defendant in turn.

18         **1.  Choice-of-Law**

19         The requirements for claims of IIED in Utah and California do not present a "true

20  conflict."  *One Beacon*, 276 P.3d at 1165 n.10.  In Utah, a plaintiff must show: (1) that the

21  defendant intentionally engaged in conduct towards the plaintiff that was extreme and outrageous,

22  (2) with the intention of inflicting emotional distress or where any reasonable person would have

23  known that it would result, and (3) the severe emotional distress was a direct result of defendant's

24  conduct. *Ellison v. Stam*, 136 P.3d 1242, 1249 n.5 (Utah Ct. App. 2006) (internal citation

25  omitted).  Under California law, a plaintiff must show: "(1) extreme and outrageous conduct by

26  the defendant with the intention of causing, or reckless disregard of the probability of causing,

27  emotional distress; (2) the plaintiff suffered severe emotional distress; and (3) the defendant's

28  extreme and outrageous conduct was the actual and proximate cause of the severe emotional

United States District Court
Northern District of California

36

distress."  *Crouch v. Trinity Christian Ctr. of Santa Ana, Inc.*, 29 Cal. App. 5th 995, 1007 (2019),

*review denied* (Dec. 11, 2019) (internal citation omitted).

Therefore, without a conflict between the states' standards for IIED claims, the Court

proceeds to an analysis of the claims themselves under Utah law.  *See Rupps*, 627 F. Supp. 2d at

1314.

### 2.   Claims

#### a.   Ms. Hafermann

It is for a court to decide, "in the first instance, whether the defendant's conduct may

reasonably be regarded as so extreme and outrageous as to permit recovery."  *Chard v. Chard*, 456

P.3d 776, 791 (2019) (citation omitted).  "Conduct is not necessarily outrageous merely because it

is tortious, injurious, or malicious, or because it would give rise to punitive damages, or because it

is illegal."  *Id.* (internal quotations and citation omitted).  "To be considered outrageous, the

conduct must evoke outrage or revulsion; it must be more than unreasonable, unkind, or unfair."

*Id.* (internal quotation and citation omitted).  "Indeed, in order to prevail on a claim for IIED, a

plaintiff must be able to prove that the defendant engaged in extraordinarily vile conduct, conduct

that is atrocious, and utterly intolerable in a civilized community."  *Id.* (internal quotation and

citation omitted).

Mr. Mandel has failed to meet his burden to allege facts that plausibly support an inference

that Ms. Hafermann's conduct was extreme and outrageous.  While Mr. Mandel argues in his

opposition that Ms. Hafermann does not offer authority in support of the proposition that stealing

property cannot constitute outrageous conduct (Dkt. No. 72 at 21), even taking as true the

allegation that she stole Mr. Mandel's computer hard drives, theft's illegality does not make it

outrageous.  *See Chard*, 456 P.3d at 791.  Mr. Mandel's second argument that it is the jury's role

to determine whether Ms. Hafermann's conduct was outrageous overlooks that a court makes the

threshold determination if a defendant's conduct may "reasonably be regarded as so extreme and

outrageous as to permit recovery."  *Id.*

Ms. Hafermann's alleged theft of Mr. Mandel's hard drives is not extreme or outrageous.

Nor can the Utah State Court's modification of the Divorce Decree constitute extreme or

1   outrageous conduct.  Furthermore, Ms. Hafermann's allegedly defamatory statements are

2   privileged and cannot serve as a predicate for Mr. Mandel's IIED claim.  Ms. Hafermann's

3   statements made in connection with the TRO Proceeding that support Mr. Mandel's defamation

4   claims satisfy the elements for Utah's "judicial proceeding privilege" as well as the elements for

5   California's litigation privilege.  Utah law requires that a statement be "(1) made during or in the

6   course of a judicial proceeding; (2) have some reference to the subject matter of the proceeding;

7   and (3) be made by someone acting in the capacity of judge, juror, witness, litigant, or counsel."

8   *Pratt v. Nelson*, 164 P.3d 366, 376 (2007) (internal quotation marks and citations omitted).

9   Statements made "preliminary to a proposed judicial proceeding" and pretrial statements satisfy

10  this first element.  *Id.*  For the same reasons Ms. Hafermann's statements made in connection with

11  the TRO Proceeding are privileged under California law, so too are they privileged under Utah's

12  judicial proceeding privilege.

13          As such, Mr. Mandel's IIED claim against Ms. Hafermann is dismissed.

14                          **b.  Ms. Ostovich**

15          Mr. Mandel's claim against Ms. Ostovich fails for the same reason.  Taking as true the

16  allegation that Ms. Ostovich stole Mr. Mandel's hard drives, conduct's illegality does not make it

17  "utterly intolerable[,]"  *Chard*, 456 P.3d at 791 (2019), and making allegedly defamatory

18  comments in connection to the TRO Proceeding likewise fail to meet the standard to make out an

19  IIED claim because they are privileged*, see Pratt*, 164 P.3d at 376.  Mr. Mandel, therefore, has

20  failed to meet his burden of showing that Ms. Ostovich intentionally inflicted emotional distress.

21                          **c.  Mr. Taylor**

22          Mr. Mandel premises his IIED claim against Mr. Taylor on Mr. Taylor's alienation of Ms.

23  Hafermann's affections.  (FAC ¶ 214.)  This allegation is insufficient to meet Mr. Mandel's

24  burden of establishing the elements for an IIED claim.

25          IIED claims are "highly subjective[,]"  and Utah courts acknowledge the "volatile nature of

26  emotional distress and the variability of its causations[.]"  *Bennett v. Jones, Waldo, Holbrook &*

27  *McDonough*, 70 P.3d 17, 30 (2003) (internal quotation and citations omitted).  Therefore, at the

28  motion to dismiss stage that the "sufficiency of [a plaintiff's] pleadings must be determined by the

United States District Court
Northern District of California

38

facts pleaded rather than the conclusions stated." *Id.* (internal quotations and citation omitted).

Here, Mr. Mandel's allegations against Mr. Taylor are impermissible conclusions rather than well-pleaded facts. The FAC alleges that Mr. Taylor engaged in "wrongful" behavior by alienating Ms. Hafermann's affections, and that this behavior is the proper predicate for an IIED claim. (FAC ¶ 214.) Earlier in the FAC, Mr. Mandel provides a timeline of Mr. Taylor's involvement with Ms. Hafermann, at one point going so far as to say that he used his wealth and charm to "poison [Ms. Hafermann's] affection of [Mr.] Mandel." (FAC ¶ 25.) The FAC describes Mr. Taylor's conduct as an "intrusion" into the marriage, but otherwise offers declarative allegations regarding when Mr. Taylor and Ms. Hafermann began their extramarital affair and their efforts to conceal it from Mr. Mandel. (FAC ¶ 27, 30.) Unless every person who entices a married spouse into an extramarital affair engages in intentional infliction of emotional distress Mr. Mandel's allegations are far too conclusory to plausibly support an inference of liability on this claim.

Accordingly, Mr. Mandel's IIED claim against Mr. Taylor is dismissed with leave to amend.

### H. Negligent Infliction of Emotional Distress

Mr. Mandel brings claims for negligent infliction of emotional distress ("NIED") against all Defendants. The factual allegations supporting these claims are the same as those supporting his IIER and IIED claims. (FAC ¶ 199-202, 212-215, 220-224.) Furthermore, the parties advance the same arguments against and in favor of dismissal of Mr. Mandel's NIED claims that were raised regarding his IIED claims. (Dkt. Nos. 55-1 at 21-22, 72 at 21, and 77 at 18.)

The Court now considers whether Utah or California law applies to Mr. Mandel's claims, and then analyzes his claims against each Defendant.

#### 1. Choice-of-Law

A conflict exists between the laws of Utah and California that govern NIED claims. Under Utah law, a claim for NIED requires establishing that the defendant: (1) "should have realized that his conduct involved an unreasonable risk of causing distress, otherwise than by knowledge of the harm or peril of a third person," and (2) "from the facts known to him, should have realized the

39

distress, if it were caused, might result in illness or bodily harm." *Anderson Dev. Co. v. Tobias*, 116 P.3d 323, 339 (Utah 2005) (internal citation omitted).  Under California law, NIED "is not an independent tort," but an articulation of a general negligence claim.  *Christensen v. Superior Ct.*, 54 Cal.3d 868, 894 (1991). A plaintiff must therefore establish "duty, breach of [that] duty, causation, and damages."  *Moon v. Guardian Postacute Servs., Inc.*, 95 Cal. App. 4th 1005, 1009 (2002).

Because the allegations giving rise to Mr. Mandel's NIED claims are the same as those motivating his IIER claims, it is unnecessary for the Court to analyze again which state has the most significant relationship to Mr. Mandel's claims.  This Court's earlier choice-of-law analysis is cross-applicable, and claims against the Defendants are governed by the following states: Ms. Hafermann, California; Ms. Ostovich, California; and Mr. Taylor, Utah.

### 2.  Claims

#### a.  California Defendants

Mr. Mandel's claims against Ms. Hafermann and Ms. Ostovich may be analyzed jointly because they fail for the same reason: taking the FAC's allegations as true, Mr. Mandel has nonetheless failed to plead that any of these Defendants owed him the duty NIED claims require.

In analyzing an NIED claim "[t]he existence of a duty of care owed by a defendant to a plaintiff is a prerequisite," and question of law decided by a court, "[when] establishing a claim for negligence." *Nymark v. Heart Fed. Savs. & Loan Ass'n*, 231 Cal. App. 3d 1089, 1095 (1991).  The California Supreme Court has cautioned that "unless the defendant has assumed a duty to plaintiff in which the emotional condition of the plaintiff is an object, recovery is available *only* if the emotional distress arises out of the defendant's breach of some other legal duty and the emotional distress is proximately caused by that breach of duty[,]" and that, "with rare exceptions, a breach of duty must threaten [more than] damage to property or financial interests." *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 985 (1993).  The court in *Chaconas v. JP Morgan Chase Bank*, 713 F. Supp. 2d 1180, 1186 (S.D. Cal. 2010), surveyed California cases providing factual circumstances in which courts have permitted plaintiffs to proceed with emotional distress claims: "a doctor misdiagnosing a plaintiff's wife with syphilis," *Molien v. Kaiser Foundation Hospitals*,

United States District Court
Northern District of California

40

27 Cal. 3d 916, 930-31 (1980); "a hired therapist sexually molesting a plaintiff's sons," *Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.*, 48 Cal. 3d 583, 591 (1989); "a school board failing to notify a plaintiff that her daughter was sexually molested by a fellow student," *Phyllis P. v. Superior Court*, 183 Cal. App. 3d 1193, 1197-98 (1986); and a "crematorium mishandling the remains of plaintiffs' close relative," *Christensen v. Superior Court*, 54 Cal. 3d 868, 894-896 (1991).

Mr. Mandel has failed to allege facts sufficient to support an inference that Ms. Hafermann or Ms. Ostovich owed a duty the likes of which these cases illustrate.  The FAC's allegation that Defendants "should have realized that their conduct could cause the sort of emotional distress that might result in illness or bodily harm" is not only implausible—how the theft of hard drives, for instance, could induce illness or cause bodily harm is, to say the least, not even pleaded—but is a conclusory allegation regarding Mr. Mandel's distress that does not illuminate what duty any Defendant owed him.  (FAC ¶ 225.)  Absent allegations of threatened physical injury, allegations of defamation, theft, wrongful termination, and adversarial lawyering are not enough to make out "the type of duty that California courts would find sufficient to state a claim for [NIED]."  *Chaconas*, 713 F. Supp. 2d at 1187.

### b.  Mr. Taylor

Mr. Mandel has failed to satisfy the elements of an NIED claim under Utah law as well.  Recent Utah cases have affirmed that, even if a defendant owed the plaintiff a duty, the plaintiff must establish "severe emotional harm that manifest[s] itself through severe mental or physical symptoms."  *Mower v. Baird*, 422 P.3d 837, 858 (2018), *as corrected* (July 11, 2018) (internal quotation and citation omitted); *see also Anderson*, 116 P.3d at 339 (requiring a plaintiff establish that a defendant "realize[d] the distress, if it were caused, might result in *illness or bodily harm*") (internal citation omitted) (emphasis added).

Mr. Mandel has not pleaded any facts that plausibly support an inference of severe mental or physical symptoms caused by Mr. Taylor's conduct.  The FAC's allegations that Defendants should have realized that their conduct "could cause the sort of emotional distress that might result in illness or bodily harm" and that their conduct caused Mr. Mandel to suffer "severe emotional

United States District Court
Northern District of California

1  distress, characterized by illness or bodily harm" are, once again, legal conclusions this Court does

2  not accept.  *See Twombly*, 550 U.S. at 570.  Accordingly, Mr. Mandel's NIED claim against Mr.

3  Taylor is insufficiently pleaded and is dismissed with leave to amend.

4      **I.  Conspiracy**

5          Mr. Mandel alleges that the Defendants formed an agreement to accomplish the "wrongful

6  objectives" set out in the FAC.  (FAC ¶ 231.)

7          **1.  Choice-of-Law**

8          California law applies to Mr. Mandel's conspiracy claim.  The unifying allegation that

9  supports his claim concerns each Defendant's defamatory statements.  (FAC ¶¶ 234-238.)  Mr.

10  Mandel's opposition also argues that the "defamation allegations alone . . . establish a claim for

11  conspiracy." (Dkt. No. 72 at 21.)  While the allegations constituting Mr. Mandel's conspiracy

12  claim reference other instances of Defendants' conduct, such as Ms. Hafermann's alleged theft,

13  each Defendant is alleged to have participated in publishing or encouraging the publication of

14  defamatory statements against Mr. Mandel.  (FAC ¶¶ 234-238.)  These defamatory statements

15  were made in California, where all defendants reside, and connected to a California legal

16  proceeding.  Accordingly, California has the most significant relationship to Mr. Mandel's

17  conspiracy claim.

18          **2.  Claim**

19          Under California law, a civil conspiracy is not considered an independent tort; it is a "legal

20  doctrine that imposes liability on persons who, although not actually committing a tort themselves,

21  share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equip.*

22  *Corp. v. Litton Saudi Arabia Ltd*., 7 Cal. 4th 503, 510-11 (1994) (citation omitted). "The elements

23  of a civil conspiracy under California state law are 1) the formation of a group of two or more

24  persons who agreed to a common plan or design to commit a tortious act; 2) a wrongful act

25  committed pursuant to the agreement; and 3) resulting damages." *Roberts v. Levine*, No. 19-cv-

26  567-WQH-BLM, 2019 WL 5650626, at *13 (S.D. Cal. Oct. 30, 2019) (quoting *Applied*

27  *Equipment*, 7 Cal. 4th at 510-11).

28          In alleging a civil conspiracy to commit a tort, courts within the Ninth Circuit have held

1   that "conclusory [allegations that are] ... not supported by any factual allegations" or "allegations

2   [that] are merely recitations of the elements of the claim ... fail to state a claim under the *Twombly*

3   standard."  *Tuggle v. City of Tulare*, No. 1:19-cv-01525-NONE-SAB, 2020 WL 3977892, at *2-3

4   (E.D. Cal. July 14, 2020) (collecting cases) ("[T]he FAC provides no factual details that directly

5   or indirectly suggest the existence of a conspiracy . . . [the counter-claimants] provide little more

6   than conclusory allegations to allege their conspiracy to commit assault and battery claim[.]")

7         Mr. Mandel has failed to state a claim under the *Twombly* standard.  Regarding the alleged

8   conspiracy, he states only that Defendants formed an agreement to accomplish wrongful

9   objectives and that they had a meeting of the minds to accomplish these objectives.  (FAC ¶¶ 231-

10  32.)  The FAC offers no supporting factual allegations that suggest the existence of a conspiracy

11  and, as such, Mr. Mandel's claim is dismissed with leave to amend.

12                                          **CONCLUSION**

13        For the reasons set forth above, the Court GRANTS Ms. Hafermann's motion to strike in

14  its entirety, and DENIES Mr. Rothenberg's motion to strike Mr. Mandel's breach of contract and

15  breach of fiduciary duty claims but otherwise grants the motion to strike with leave to amend.

16        Regarding the motion to dismiss, the Court dismisses with leave to amend the following

17  claims: against Ms. Hafermann, breach of contract, promissory estoppel, unjust enrichment,

18  breach of implied covenant of good faith and fair dealing, wrongful discharge, breach of fiduciary

19  duty, and abuse of process regarding the Utah mediation; and against Ms. Hafermann, Ms.

20  Ostovich, and Mr. Taylor, claims for IIER, IIED, NIED, and conspiracy. Mr. Mandel's claims for

21  theft, conversion, and alienation of affections survive the motion to dismiss.

22        The Court is granting Mr. Mandel leave to amend, but expects that any amended complaint

23  will recognize that the case is in California federal court and that California law applies—and

24  bars—many of the previously pled claims.  Mr. Mandel may not add any new claims (as opposed

25  to amend previously pled claims) without further leave of court.  Any amended complaint must be

26  filed within 21 days of this Order.  The case management conference scheduled for December 3,

27  2020 is continued to February 18, 2021 at 1:30 p.m.  A joint case management conference

28  statement is due one week in advance.

United States District Court
Northern District of California

1    This disposes of Dkt. Nos. 53, 54, and 55.

2    **IT IS SO ORDERED.**

3    Dated: November 30, 2020

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California